ATTORNEYS FOR APPELLANT
Peter J. Rusthoven
Joseph G. Eaton
Paul L. Jefferson
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
DEFENSE TRIAL COUNSEL OF INDIANA
Kevin C. Schiferl
Lucy R. Dollens
Indianapolis, Indiana

James D. Johnson
Evansville, Indiana

ATTORNEYS FOR APPELLEES
Robert J. Palmer
Mishawaka, Indiana

Steven T. Parkman
South Bend, Indiana

Richard L. LaSalvia
South Bend, Indiana



In the

# Indiana Supreme Court

No. 45S05-0711-CV-528

SPEEDWAY SUPERAMERICA, LLC,

*Appellant (Defendant below),*

v.

GERALD AND MADELINE HOLMES,

*Appellees (Plaintiffs below).*

Appeal from the Lake Circuit Court, No. 45C01-0111-CT-389
The Honorable Lorenzo Arredondo, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 45A05-0506-CV-332

**May 15, 2008**

**Boehm, Justice.**

In this case the prevailing party at trial discovered potentially highly relevant and favorable evidence ten days before trial but did not communicate the discovery to the opposing party until the first day of trial. The evidence was admitted, but posttrial testing revealed that the evi-

dence was not what it was represented to be. Under these circumstances, we hold that a motion to test the evidence filed within the time for a motion to correct error satisfies the diligence required of the opposing party to seek a new trial based on newly discovered evidence. We remand for a new trial.

## Facts and Procedural History

On May 31, 2000, Gerald Holmes set out in his refrigerated truck to transport a load of cheese from Wisconsin to Michigan. His wife, Madeline, frequently traveled with him and was along for the ride. As was their custom, Gerald and Madeline stopped for the night at the halfway point, a truck stop in Lake County, Indiana.

The following is a summary of Gerald's testimony. The morning of June 1, 2000 was clear and dry. Gerald rose early, purchased some coffee for Madeline and himself, and prepared his logbook for the day. Around 6:00 a.m., he pulled his truck up to the truck stop's fuel island. He placed a pump in the driver's side of his truck, then walked around the truck to place the "slave pump" in the passenger side. "When I did, I slipped and I fell. I came down on my knee and as I come down on my knee, I twisted and landed on my back and my feet went out from underneath me and they went up underneath the truck." As a result of the fall, "[m]y clothing was wet. My total buttocks was covered with diesel fuel."

Gerald's back had struck the curb of the fueling island and his knee was "hurting really bad." At that point he saw "a black spot there next to the slave pump" that he "knew" was diesel fuel. He finished fueling and went inside to report his fall to the cashier. He was "frustrated" and "irate" and used many "choice words." The cashier explained that the manager would not be in the store for another hour or hour and a half, and that she would let the manager know of the incident. Gerald testified that he requested to make an incident report, and gave the cashier his contact information on a scrap piece of paper. He then returned to his truck for fifteen to twenty minutes to get clean pants, and proceeded to the shower area for another ten or fifteen minutes to clean up and change his pants.

Madeline testified that she was sitting on the passenger side of the truck with her window rolled down. She saw Gerald fall, then left the truck to help him up and saw "a wet spot along the curb of the, where the pumps station is."

2

Financial records reflect that the purchase of fuel occurred between 6:50 a.m. and 7:04 a.m. Gerald and Madeline then left the Speedway station for their destination approximately five hours away. On the way to Michigan, Gerald noticed his knee starting to swell and called his trucking company's safety department to describe the incident. The following day, he sought treatment at an emergency room. He has since undergone physical therapy, epidural injections for back pain, and knee surgery. Gerald was not asked, and the record does not reveal, whether either Gerald or Speedway followed up on the information Gerald testified he left with the cashier.

On November 13, 2001, Gerald and Madeline filed a complaint for damages against Speedway SuperAmerica, LLC, the owner of the truck stop. Three weeks before trial, Gerald and Madeline's original attorney, Richard LaSalvia, engaged Steven Parkman as co-counsel. Parkman met with Gerald and Madeline for the first time ten days before trial. At that meeting, Parkman asked whether they still had the jeans and boots Gerald was wearing when he fell. Madeline responded that "she believed she had the jeans but would have to look." Parkman asked them to bring the items to court. Parkman next met with Gerald and Madeline on Sunday, December 12, 2004, the day before the trial. They informed him that they had found the jeans and boots but had left them in the car. Parkman did not examine the jeans or boots. LaSalvia had not considered using the jeans or boots as trial exhibits.

The trial began on December 13, 2004. On that morning, Parkman for the first time advised Speedway's counsel, Todd Conover, "that the Plaintiffs had brought the jeans and boots but had left them in the car and that we would be considering attempting to introduce those into evidence." Conover did not inspect the items at that time, and neither party notified the trial court of the possibility of new exhibits.[1]

Gerald was called as a witness the next day. On direct examination, Parkman asked Gerald if he still had the jeans he was wearing on the day of the fall. Gerald answered that he had located them "this summer" and they were now in his pickup truck parked outside the courthouse. In the presence of the jury, Parkman then stated,

---

[1] The facts in the previous paragraph and this paragraph were not presented at trial and are taken from affidavits of Parkman and LaSalvia presented in opposition to Speedway's posttrial motions, described infra.

I'm giving this notice to Mr. Conover so that if he will allow us to display them in your wife's testimony. But we'll move forward. They're not on the exhibit list. We will announce to the jury and the Court, so you'll have to maybe rule if he has an objection on that issue, your Honor.

Parkman then resumed questioning Gerald on unrelated issues.

While the jury recessed for lunch, the trial court held a bench conference on admission of the jeans. Parkman described the jeans as having a "stain somewhat dark and on the seat of the pants that goes all the way through the material of denim, and some staining, it appears, on the right leg." Parkman conceded that the jeans were not on the pretrial exhibit list. Conover objected to the introduction of the jeans:

> Judge, I'm going to object to the either the showing or introduction of the jeans in that we are way post-accident. It would be highly prejudicial, I think, and inflammatory. It could plant an idea in mind that this stain, whatever it may be, is diesel fuel.
>
> Secondly, had these been produced, we could have tested these to determine whether or not it was in fact diesel fuel. . . . [W]e're highly prejudiced and we did ask for anything that would be produced at trial. So, we'd have a chance to look at it and, specifically had it been produced, we could have, at some point, tested them. . . .
>
> There is a test for diesel fuel we've used before. To allow the jury to see it now, I think, would be inflammatory and extremely prejudicial. Who knows what inference they will draw from that and I think most importantly, the standard discovery rules say what he planned to introduce.
>
> This is not just a minor demonstrative piece of evidence that might have been overlooked. It's major. And I can't believe that it would take this long. The plaintiff just happened to have discovered these particular pair of jeans, you know? Is it the same pair of jeans? The condition and period of time that has lapsed, those jeans is highly questionable.

The trial court ruled that it would admit both the jeans and the boots, but would "specifically prohibit any testimony or inference that the stain is, in fact, diesel fuel."

The jury returned and Parkman resumed direct examination of Gerald. Gerald testified that he was wearing the jeans on June 1, 2000, and had not worn them since. Gerald testified that the jeans had a stain that was not present before June 1, 2000, and was a "result of what happened" on that date. He also testified that the boots had an "oil resistant, non skid surface," and that his company required him to wear that type of boot. He explained that the jeans had been forgotten in the barn after his younger brother cleaned out the truck when it was repossessed be-

4

cause of Gerald's inability to work.  He further testified that he "never got around to going through the stuff, and we were out in the barn and we found them."

Madeline also testified that the jeans were those worn by Gerald when he fell, that they had no spots before the fall, and that Gerald and his grandchildren found them in the barn with some other trucking items that Gerald's brother had packed up.  Madeline further testified that since the fall she had washed the jeans with "either mineral spirits or turpentine."

Other evidence presented at trial challenged Gerald and Madeline's version of events and supported Speedway's theory that Gerald fell from his truck and did not slip on diesel fuel. Tabitha Maxwell was the cashier, and Joy Hudson was the station manager on June 1, 2000.  At the time of the trial Maxwell was no longer a Speedway employee, but Hudson remained with Speedway.  Hudson said she arrived early that day because it was the first of the month and "stick readings" needed to be performed in addition to her daily duties incident to the 6:00 a.m. shift change.  Both Hudson and Maxwell testified that Hudson was at the store at the time of the alleged fall.  Speedway's answers to interrogatories stated that Hudson was "on duty" at 6:00 a.m. that day.  Speedway's shift change policy requires employees to "inspect the lot for oil spills, gasoline spills, miscellaneous debris, and/or any other circumstances that would give rise to slip, trip and fall types of incidents. . . . Any incident that could be deemed hazardous is to be handled immediately."  Both Maxwell and Hudson testified that they followed this policy and had checked the lot within the half hour before 6:00 a.m. on June 1, 2000.  Both said they were aware of no spill that morning.  They also testified that Speedway employed a maintenance man whose shift began at 6:00 a.m. and who patrolled the lot hourly.

No incident report was offered in evidence.  Hudson testified that whenever a diesel spill was reported, Speedway required her to complete an incident report that included the identity of the customer, a description of the incident, and photographs taken by Hudson.  Hudson testified that Speedway policy required her to mail all incident reports to corporate headquarters.  Maxwell testified that the policy required her to notify her supervisor of all personal injury reports, and that the customer "would wait" for the supervisor.  Both Hudson and Maxwell testified that failure to comply with this policy would cost them their jobs.  Maxwell testified that in her ten months as a Speedway cashier, no customer had complained to her about a diesel spill.  She also

testified that she had no independent recollection of Gerald. Finally, Gerald's June 2, 2000, hospital admission record describes his injury as "right knee injury fell of f [sic] truck yesterday."

The jury awarded damages to Gerald in the amount of $1,125,000, reduced to $562,600 to reflect its finding that Gerald bore fifty percent of the fault. The jury awarded Madeline no damages. The trial court entered judgment on the verdict on December 20, 2004.

On January 19, 2005, Speedway filed a "Motion to Correct Error and for Relief from Judgment Under Indiana Trial Rules 59 and 60." Among other things, Speedway argued that the trial court erred in admitting into evidence "undisclosed and untested exhibits." Speedway also argued that testing of the jeans would reveal "newly discovered evidence which could not have been discovered and produced by Speedway at trial." Speedway identified several issues it claimed a test would resolve. These included whether the stain was diesel fuel, and if so, when that fuel was produced, and whether the fuel contained additives specific to Speedway diesel fuel. Speedway simultaneously filed a "Motion to Preserve Evidence and Conduct Destructive Testing" on the jeans. Over the plaintiffs' objection, the trial court granted Speedway's motion to test the jeans. When the tests were completed, Speedway renewed its request for relief under Trial Rule 60(B)(2) alleging newly discovered evidence, and the trial court conducted a hearing.

A chemist's written report concluded that the stained areas did not contain diesel fuel, turpentine, or mineral spirits, but the jeans had been laundered with detergent. The chemist also testified that had diesel fuel, turpentine, or mineral spirits ever been present on the jeans, he would have expected to have seen evidence of them because he saw evidence of compounds of similar volatility. Examination of codes on the jeans' label revealed that the jeans had not yet been manufactured as of the date of Gerald's fall, June 1, 2000, and therefore could not have been worn on that date. The fabric was not in use until after November 2000, and this pair of jeans was manufactured in 2001 and was not available for sale before April or May 2001. Despite these results, both Gerald and Madeline maintained in affidavits that they were "nearly 100% certain that the jeans that were entered into evidence were the jeans Gerald was wearing at the time" of the fall. No testing was performed on the boots.

The trial court considered the test results and denied Speedway's request. Specifically, the trial court found that

6

[Speedway] did not establish intentional misrepresentation on the part of the Plaintiffs in offering the jeans and boots as exhibits at the trial of this matter. Additionally, it was within the discretion of the trial court to allow the jeans and boots to be admitted, and there was no showing of an abuse of discretion. Lastly, [Speedway's] remedy at trial was to request a continuance, and [Speedway] failed to do so.

Speedway filed a timely appeal of the trial court's order denying its Trial Rule 60(B)(2) motion for a new trial on the basis of newly discovered evidence. Speedway also filed a motion in the trial court for the first time seeking relief under Trial Rule 60(B)(3) and alleging intentional misrepresentation by the plaintiffs. The trial court's ruling on the 60(B)(2) motion had already found no intentional misrepresentation, and the trial court denied Speedway's 60(B)(3) motion without explanation. Speedway then appealed the denial of its 60(B)(3) motion, and the Court of Appeals consolidated the two appeals. Gerald and Madeline cross-appealed, contending that the trial court improperly granted Speedway's motion to perform destructive testing.

A majority of the Court of Appeals affirmed both of the trial court's orders denying Speedway relief. Speedway SuperAmerica, LLC v. Holmes, 866 N.E.2d 304, 306 (Ind. Ct. App. 2007). The majority concluded that Speedway was not entitled to relief under either Trial Rule 59 or 60(B)(2). First, the majority reasoned that "by choosing not to object to its introduction or request a continuance to test the jeans, Speedway made a conscious decision to take its chances with the jury without the evidence it now deems crucial for the administration of justice." Id. at 311. Second, the majority concluded that had Speedway acted diligently after trial, it reasonably could have discovered the new evidence within thirty days after judgment. Id. The majority also concluded that Speedway was not entitled to relief under Trial Rule 60(B)(3) because Speedway's 60(B)(3) motion was a "repackaged" attempt to relitigate its 60(B)(2) motion. Id. at 312–13. Judge Bailey dissented, reasoning that although "it would have behooved Speedway to ask for a continuance to obtain testing of the substance thereon (in addition to interposing their objection)," this was a "clear case" for equitable relief under Trial Rule 60(B)(3). Id. at 313–14. Judge Bailey explained that he did not believe that "litigants should be ever vigilant to suspect that physical exhibits are [wholly fabricated] or risk waiver." We granted transfer. Speedway SuperAmerica, LLC v. Holmes, 878 N.E.2d 218 (Ind. 2008) (table).

## Standard of Review

We review a denial of a request for new trial presented by a Trial Rule 59 motion to correct error or a Rule 60(B) motion for relief from judgment for abuse of discretion. <u>Outback Steakhouse of Fla., Inc. v. Markley</u>, 856 N.E.2d 65, 72 (Ind. 2006) (citing <u>Stonger v. Sorrell</u>, 776 N.E.2d 353, 358 (Ind. 2002)) (Rule 60(B)); <u>Paragon Family Rest. v. Bartolini</u>, 799 N.E.2d 1048, 1055 (Ind. 2003) (citing <u>Sanchez v. State</u>, 675 N.E.2d 306, 310 (Ind. 1996)) (Rule 59).

## Newly Discovered Evidence

The Indiana Rules of Trial Procedure provide two related procedures for addressing material evidence that remains undiscovered until after trial. Trial Rule 59(A)(1) permits a party to file a motion to correct error to address "[n]ewly discovered material evidence, including alleged jury misconduct, capable of production within thirty (30) days of final judgment which, with reasonable diligence, could not have been discovered and produced at trial." Similarly, and incorporating the requirements of Trial Rule 59(A)(1), Trial Rule 60(B)(2) permits a party to move for relief on grounds of "newly discovered evidence, which by due diligence could not have been discovered in time to move for a motion to correct errors under Rule 59."

As a preliminary matter, the plaintiffs point out that despite Speedway's objection to the jeans at the lunch hour bench conference, when Parkman moved to admit the jeans after the jury returned, Conover stated, "No objection, Judge." The plaintiffs argue that Speedway's failure to object to the formal admission of the jeans waived its claim for a new trial based on newly discovered evidence. We do not agree. Speedway's argument on appeal is not that the jeans should have been excluded, but that new evidence derived from testing of the jeans requires a new trial.

Indiana courts have long received motions for a new trial with "great caution" because courts place "a high value on finality of judicial resolutions." <u>Stephenson v. State</u>, 864 N.E.2d 1022, 1049 (Ind. 2007); <u>Carter v. State</u>, 738 N.E.2d 665, 671 (Ind. 2000) (citations omitted). The decision to grant a new trial is an equitable one, and requires the court to "balance the alleged injustice suffered by the party moving for relief against the interest of the winning party and society in general in the finality of litigation." <u>Estate of Lee ex rel. McGarrah v. Lee & Urbahns Co.</u>, 876 N.E.2d 361, 371 (Ind. Ct. App. 2007) (quoting <u>Rogers v. R.J. Reynolds Tobacco</u>

Co., 731 N.E.2d 36, 51 (Ind. Ct. App. 2000), vacated in part on other grounds by Rogers v. R.J. Reynolds Tobacco Co., 745 N.E.2d 793 (Ind. 2001)).  Reflecting this concern for finality, new evidence requires a new trial only when the party seeking relief demonstrates that:

> (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial.

Carter, 738 N.E.2d at 671 (citing Fox v. State, 568 N.E.2d 1006, 1007 (Ind. 1991)); see also Wiles v. State, 437 N.E.2d 35, 39 (Ind. 1982) (citing Tungate v. State, 238 Ind. 48, 54–55, 147 N.E.2d 232, 235–36 (1958)).  For the reasons described below, we conclude that the test results obtained by Speedway meet these requirements and require a new trial.

Several of the nine elements are uncontested:  neither party suggests that the test results existed before trial, are privileged, or could not be produced on retrial.  Further, the test results are highly relevant because they bear on the authenticity of a trial exhibit which plaintiffs described in their motion opposing destructive testing as "the only real evidence in this case."  The test results are not cumulative of any other evidence.  And although the results do impeach the plaintiffs' testimony about the jeans, they are not merely impeaching because they invalidate the foundation of the single physical exhibit supporting negligence and causation.  See Wilson v. State, 677 N.E.2d 586, 588 (Ind. Ct. App. 1997) ("[E]vidence which destroys or obliterates the testimony upon which a conviction was obtained is not appropriately considered as merely impeaching evidence." (citing Dennis v. State, 103 Ind. 142, 151–52, 2 N.E. 349, 355 (1885))).

As to creditworthiness, the plaintiffs point out that they have not had the opportunity to cross-examine Speedway about the chain of custody of the jeans or whether the tag was altered.  The trial court's order permitting testing specifically addressed these concerns.  Speedway was ordered to document the chain of custody and videotape all testing, and all parties were permitted to attend the testing.  No evidence suggests that the test results are unreliable, and the plaintiffs are certainly free to conduct their own tests because only "small" portions of the jeans were destroyed in the testing, and presumably adequate portions remain for renewed testing.

We think the test results would probably produce a different result at trial.  The facts surrounding the fall were disputed at trial, and Speedway's theory of defense was that "Holmes

simply fell from his truck, rather than slipping on any spilled diesel fuel." Other than the jeans, the only evidence that Gerald slipped specifically on spilled diesel fuel was Gerald's and Madeline's testimony. This testimony was rebutted by testimony of Speedway employees that there were no spills that morning, no one complained of a fall or filed an incident report, and the cashier did not remember Gerald, despite his testimony that he was "irate," "soaked" in diesel fuel, and used "choice words" when reporting the incident.

The jury's finding that Gerald and Speedway were each fifty percent at fault underlines the significance of the jeans, which seem likely to have tipped the balance of fault at least somewhat. Under Indiana's Comparative Fault Act, a fifty-one percent allocation of fault to Gerald would have produced a judgment for Speedway. Ind. Code § 34-51-2-6 (2004). Moreover, the trial court's order prohibiting "any testimony or inference that the stain is, in fact, diesel fuel" was of no help to Speedway. Gerald testified that the stain was a "result of what happened" on June 1, 2000, and that on that date he fell on a spot he "knew" was diesel fuel. Gerald's testimony thus claimed the stain was diesel fuel. Indeed, if the stain were not diesel fuel, it is difficult to see the relevance of the exhibit.

The only significant issue is whether Speedway exercised due diligence in obtaining the test results. Plaintiffs contend that Speedway failed to exercise due diligence before trial, during trial, and after trial. First, they contend that Speedway could have "specifically requested production of the jeans in discovery" and presumably performed tests before trial. This asks too much. Speedway specifically requested "[a]ll exhibits plaintiff intends to offer at trial," and this request yielded only medical records and bills. Speedway might well have uncovered the jeans or secured a response that they no longer existed if it had pursued discovery with the zeal and skill that with hindsight might seem desirable. But it was the plaintiffs and their counsel who sprung the existence of the jeans at the opening of trial after identification of all exhibits had long been put to bed. Moreover, it is speculative whether these jeans would have been identified if, at earlier stages of discovery, Speedway had specifically requested production of Gerald's clothing worn on June 1, 2000.

"Due" diligence is a relative term. Speedway's failure to recognize the possible significance of Gerald's clothing was shared by the plaintiffs until the eve of trial. Plaintiffs' original

10

counsel had not considered using the jeans as an exhibit, and the plaintiffs' brief characterizes the jeans as "an afterthought previously overlooked by all parties." If that were all there is to this case, we would agree that Speedway had not pursued the jeans with the diligence required for a new trial. We accept the trial court's finding that there was no intentional misrepresentation. But even if the plaintiffs' belief in the authenticity of the jeans was genuine, if mistaken, the plaintiffs nonetheless failed to alert Speedway to the existence of the jeans as soon as they came to light. Had they done so, a continuance or expedited testing of the jeans could have been accomplished without disrupting the court's schedule and inconveniencing a jury pool already assembled. Plaintiff's failure to report the jeans also deprived Speedway of any time for considered response. And it turns out that the jeans were not what they were represented to be—the pants Gerald wore on June 1, 2000. Given that the plaintiffs' oversights, even if innocent, created this problem, we find Speedway's less than perfect pretrial discovery to be sufficiently diligent.

Second, the plaintiffs contend, and the Court of Appeals agreed, that Speedway failed to exercise due diligence by not requesting a continuance to test the jeans when they were introduced at trial. Speedway SuperAmerica, LLC v. Holmes, 866 N.E.2d 304, 311 (Ind. Ct. App. 2007). Again, this asks too much. When a party is confronted with surprise evidence, "ordinarily the proper response is to move for a continuance." O'Connell v. State, 742 N.E.2d 943, 948 (Ind. 2001); see also Outback Steakhouse of Fla., Inc. v. Markley, 856 N.E.2d 65, 78 (Ind. 2006) (stating O'Connell rule in civil context). We agree with Judge Bailey that it would have "behooved Speedway to ask for a continuance to obtain testing," Speedway, 866 N.E.2d at 314 (Bailey, J., dissenting). But Speedway's surprise resulted from the plaintiffs' attorney's failure to mention the jeans until the morning of trial, even though he learned ten days earlier that the plaintiffs claimed the jeans existed, and learned the night before trial that the plaintiffs had located the jeans and would bring them to trial. Gerald and Madeline are of course equally chargeable with this late inning surprise, assuming they in good faith believed the jeans to be those worn on the date of the incident. Neither party followed the rules flawlessly. However, as between the two parties, the plaintiffs should not benefit from a situation they precipitated by day-of-trial identification of the jeans as an exhibit.

11

The plaintiffs contend that granting a new trial despite Speedway's failure to request a continuance would "reward Speedway for a strategic decision gone awry and giv[e] it a second chance after entry of judgment." They argue that Speedway's skepticism of the jeans at trial and awareness of a test for diesel fuel suggest that Speedway made a strategic decision not to ask for a continuance. They suggest that had the testing revealed diesel fuel, the jury may have returned an even larger verdict, and had the jury returned a verdict for Speedway without testing, nothing would have been lost. We acknowledge that this characterization of Speedway's actions may be accurate. And if the plaintiffs had timely disclosed the exhibit we would agree that the trial court could conclude that failure to move for a continuance or to conduct expedited testing is insufficient diligence to grant a new trial. But this is not a case where Speedway knew all along that the plaintiffs had the jeans but chose to remain ignorant of their properties and save a card to play in case of an unfavorable verdict.

Speedway was informed of the jeans' existence on the morning of trial and had no facts with which to challenge the plaintiffs' representations about the jeans. Parties are understandably reluctant to request a continuance when the jury pool has already been assembled. A continuance at that point imposes a significant cost and inefficiency on the courts and the parties, and may be burdensome for other resources as well. Requiring such a motion to preserve remedies for an opponent's belated springing of evidence on the day of trial gives the party discovering new evidence the ability to force the opponent to choose between seeking a continuance or going to trial with the untested evidence. Such a requirement rewards failures of the discovering party, whether failure to make timely disclosure was intentional or inadvertent. If evidence is truly discovered on the eve of trial without fault of the discovering party, requiring that choice may be acceptable. But when, as here, it is discovered ten days before trial and kept from the opponent, the discovering party should not be permitted to gain this tactical advantage. We cannot say that failing to request a continuance was a failure to exercise due diligence to discover the new evidence developed in posttrial testing.

Finally, the plaintiffs contend, and the Court of Appeals agreed, that in the exercise of due diligence, Speedway could have obtained the new evidence, or at least requested to test the jeans, within the thirty days after judgment. Speedway, 866 N.E.2d at 311. Speedway had to file a motion to test the jeans, by then in the possession of the court, and wait for the plaintiffs'

12

response, a hearing, and an order permitting testing.  Speedway also had to find an analytical chemist and someone with knowledge of label coding, send the jeans for testing, and provide its experts with time to perform their tests and prepare reports.  All of these activities were required over the holiday season.  Assuming it was possible to act more quickly, the plaintiffs point to no disadvantage from the passage of thirty days after trial, and Speedway's motion was filed within the period allowed by Trial Rule 59 for a motion to correct error.  A new trial is therefore appropriate under Trial Rule 60(B)(2).

We do not suggest that a new trial is required whenever evidence appears at the eleventh or, as in this case, the thirteenth hour.  Critical exhibits rarely surface within the weeks before trial, but when they do, parties considering offering them, and parties who have ongoing discovery obligations, are obligated to inform opposing counsel immediately.  Even if the jeans were authentic, failure to communicate their existence shifted the practical burden of this late discovery to the innocent opposing party.  If, as seems to be the case, the jeans were not what they appeared to be, the problem is compounded.  The unusual circumstances surrounding this case lead us to conclude that equity requires a new trial.

Because we conclude that a new trial is appropriate under Rule 60(B)(2), we need not address Speedway's claim under Rule 60(B)(3).  As to the plaintiffs' cross-appeal that the trial court erred in granting Speedway's motion to test the jeans, that claim is based on the same arguments that Speedway did not exercise due diligence before and during trial.  For the reasons discussed above, we affirm the trial court's grant of Speedway's motion to test the jeans.

### Conclusion

The order of the trial court denying Speedway's Motion to Correct Error and for Relief from Judgment under Indiana Trial Rules 59 and 60 is reversed, and the trial court's grant of Speedway's motion to test the jeans is affirmed.  The case is remanded with instructions to vacate the judgment and schedule a new trial.

Shepard, C.J., and Dickson, Sullivan, and Rucker, JJ., concur.

13