

**FILED**

May 15 2023, 9:07 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Jessica N. Hamilton
Leslie B. Pollie
Kopka Pinkus Dolin PC
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Kevin S. Smith
Church Hittle + Antrim
Noblesville, Indiana

Michael W. Phelps
Hankey Law Office
Indianapolis, Indiana

Kevin J. Hinkle
Hinkle Law Firm, P.C.
Danville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Menard, Inc.,
*Appellant-Defendant*,

v.

Marilyn K. Terew,
*Appellee-Plaintiff*.

May 15, 2023

Court of Appeals Case No.
22A-CT-1679

Appeal from the Hendricks
Superior Court

The Honorable Mark A. Smith,
Judge

Trial Court Cause No.
32D04-1908-CT-99

**Opinion by Judge Brown**
Judges Bailey and Weissmann concur.

**Brown, Judge.**

[1] Menard, Inc., appeals the judgment against it and in favor of Marilyn K. Terew following her fall. We affirm in part, reverse in part, and remand.

*Facts and Procedural History*

[2] On February 10, 2019, Terew fell in the parking lot of Menard's store in Avon, Indiana, and sustained injuries. Terew filed a lawsuit alleging that she slipped and fell on an ice-filled depression in a parking space that had been covered by snow, Menard hired Fisher's Lawn Care and Snow Removal LLC to perform snow and ice removal, and Menard and Fisher's Snow Removal breached the duty of care they owed to her to protect her from the hazardous condition. Prior to trial, Menard filed a motion to exclude Harold Richard Hicks, a forensic engineering consultant, as an expert witness, and the court denied the motion. Menard filed a motion in limine requesting the court to exclude photographs depicting the location of Terew's fall which were not an accurate depiction of the location at the time of her fall and argued that photos of the site taken days and months after her fall were irrelevant, likely to confuse and mislead the jury, and would invite a jury verdict based on speculation and inference rather than evidence, and the court denied the motion.

[3] In March 2022, the court held a jury trial. The court, over Menard's objection, admitted a photograph as Plaintiff's Exhibit 5. The court also allowed Terew to present the testimony of Hicks regarding the condition of the parking lot at the time of Terew's fall. The jury found Terew was entitled to recover $4 million in

damages and calculated damages against Menard to be $3.8 million and damages against Fisher's Lawn Care and Snow Removal LLC to be $200,000. Menard filed a motion to correct error arguing the sum of Terew's special damages as stipulated by the parties was $40,503.09 and the record was devoid of evidence justifying the enormous verdict. Following a hearing, the court denied the motion to correct error.

## Discussion

### I.

Menard first challenges the trial court's admission of the photograph admitted as Plaintiff's Exhibit 5 and the testimony of Hicks. We generally review the trial court's decision to admit evidence for an abuse of discretion. *Helena Agri-Enterprises, LLC v. Jones*, 149 N.E.3d 282, 295 (Ind. Ct. App. 2020), *trans. denied*. The Restatement provides:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he:
>
> > (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
> >
> > (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
> >
> > (c) fails to exercise reasonable care to protect them against the danger.

RESTATEMENT (SECOND) OF TORTS § 343.

A. *Plaintiff's Exhibit 5*

We first discuss the photograph admitted as Plaintiff's Exhibit 5. At trial, Dale Bunch testified that he was with Terew on the day of her fall. He testified there were flurries when they traveled to the store. He further testified that, when they left the store, "I guess it had snowed more than a little flurries and you just, uh, it was slick so we just, I walked gingerly. I had the cart to hold onto to stabilize myself . . . but it was, the ground was covered now." Transcript Volume II at 122. He indicated Terew walked at "a slow pace . . . [g]ingerly" and that she fell. *Id*. at 123. He indicated he took the photographs admitted as Stipulated Exhibits 1 through 6 on the day of Terew's fall.[1] Terew's counsel moved to admit a photograph as Plaintiff's Exhibit 1, and Menard objected based on relevance and stated: "These were taken at a date after the incident. They were taken under different weather conditions and . . . they don't show an accurate depiction at the time of the incident and they . . . would tend to . . . mislead the jury as well." *Id*. at 132. The court overruled the objection and stated "photographs don't have to be a complete and total accuracy and I think those are weight issues for the jury to give to the exhibit." *Id*. at 133. Terew then moved to admit additional photographs as Plaintiff's Exhibits 2 through 7, Menard renewed its objection, and the court admitted the photographs.

---

[1] Stipulated Exhibits 1 through 6 show snow covering the surface of the parking lot.

[6] Terew's counsel referred to Plaintiff's Exhibit 5 and asked Bunch "does this generally fairly and accurately depict what was hidden by that layer of snow that day that [Terew] fell," and Bunch answered "[y]es." *Id*. at 137. Terew's counsel stated "Exhibit 5 which I'll represent to you was taken on [] March 5," Menard's counsel objected and stated "that evidence hasn't even been established yet," the court noted "[y]ou didn't establish a date" and asked "[i]s it date stamped on the photograph," Terew's counsel replied "[n]o . . . we'll have a witness testify," and the court stated "[o]kay." *Id*. at 140. Terew's counsel then asked Bunch "forget about the date . . . in your mind does that corroborate your observation that there was ice under that snow where [Terew] fell," and Bunch answered "[y]es." *Id*. at 141. Later, during Hicks's testimony, Terew's counsel referred to photographs admitted as Plaintiff's Exhibits 5 through 7 and asked, "in your file does it note that those photographs were taken on March 5 of 2019," and Hicks testified "I think so," "I can't find any notes about when it was taken," and "March 5 sounds right but I [] can't find the note." Transcript Volume III at 60. On re-cross examination, Hicks indicated he did not take the photographs and was not sure who did.

[7] On appeal, Menard argues that Plaintiff's Exhibit 5 was "a photograph depicting Menards' parking lot allegedly taken after [Terew's] accident, though [she] never established the date, and showing the lot clear of snow with a lone, distinct icy patch of unknown dimensions in a parking space near the area where [she] allegedly fell." Appellant's Brief at 24. It argues Terew's counsel "asked Mr. Bunch to make the same evidentiary leap he encouraged the jury to

make, i.e., if ice existed there on a subsequent occasion, it *must have* been there on the date of [Terew's] fall." *Id*. at 26. It also argues that Terew focused much of her case on the photograph, referred to the photograph multiple times, and "paraded [Plaintiff's Exhibit 5] in front of the jurors and confused them with the inference that if ice existed there four weeks later, ice *must have existed* in the same spot from February 7-10." *Id*. at 27.

[8]     Ind. Evidence Rule 401 provides evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. Ind. Evidence Rule 403 provides the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence.

[9]     Plaintiff's Exhibit 5 consists of a photograph depicting a patch of ice in one area of a parking lot and no other ice on the lot surface. If the photograph was taken on March 5, 2019, then it depicts the condition of the surface of the lot twenty-three days after Terew's fall. Nevertheless, the testimony was clear that the photograph was taken some time after the day of Terew's fall. This is also clear because the exhibits contain a number of photographs taken on the day of Terew's fall which show snow covering the surface of the parking lot, a number of photographs which were taken at a later date which show a mostly clear lot surface, and a number of photographs taken by Hicks as a part of his site inspection. Although Menard argues the photograph in Plaintiff's Exhibit 5 appears to depict a patch of ice and that Terew focused on the photograph, we

note that other photographs were before the jury showing the same area and parking space from various angles. When asked "did you go and inspect that area" on the day of the fall, Bunch testified "I shuffled my foot across it. You can see a little ice there, but you can see down where the black ice is." Transcript Volume II at 127. When asked "[h]ow certain are you that there was ice there," Bunch replied: "It's, it was ice." *Id.* Terew testified that she returned to the lot on February 22, 2019, at that time there was no snow, she "saw what [she] considered to be a shallow depression . . . a slight depression in the parking spot," and "there was standing water in that depression . . . was the conclusion that we thought." Transcript Volume IV at 16. The jury was able to consider Plaintiff's Exhibit 5 together with the other photographs and the testimony of Bunch and Terew regarding their observations on the day of Terew's fall as well as the testimony of the other witnesses, the evidence regarding the depression in the parking lot and whether ice had formed in the depression, and the extent to which Menard by the exercise of reasonable care should have discovered the condition, realized it involved an unreasonable risk of harm, and expected that its customers would not discover or realize the danger or would fail to protect themselves against it. Based on the record, we cannot say the challenged photograph was not relevant or that its probative value was substantially outweighed by a danger of unfair prejudice or misleading the jury.

B. *Hicks's Testimony*

[10] We next turn to Hicks's testimony. Menard argues that "[t]he trial court's error permitted Mr. Hicks to create facts from inference as needed to prove [Terew's] case – specifically, fall causation and Menards' constructive notice" and his testimony "prejudiced the jury by presenting unsupported speculation delivered under the luster of 'expert opinion.'" Appellant's Brief at 32. It argues Hicks's opinion was not based on scientific principles or specialized knowledge.

[11] Ind. Evidence Rule 702(a) provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. Ind. Evidence Rule 702(b) provides expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles. Ind. Evidence Rule 703 provides that an expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed and may testify to opinions based on inadmissible evidence provided that it is of the type reasonably relied upon by experts in the field.

[12] At trial, Menard's counsel argued that Hicks's testimony was not relevant, the risk under Evidence Rule 403 was substantial, and his conclusions were common sense conclusions and not based on any scientific data. The court allowed Hicks to testify.

[13] Hicks testified regarding his educational background and experience as a forensic engineer. He testified that he reviewed the photographs taken after the fall by Bunch and the weather information provided by Terew's counsel, the weather information came from the Indianapolis International Airport weather station, that station was the nearest major weather station, and experts in his field customarily and reasonably rely on the data from that weather station. He further testified that he inspected the site, measured the dimensions of the depression in the asphalt, and took photographs of the depression including photographs showing a level pointed at the depression and measuring tape across the depression. He indicated the length of the depression was forty-one inches and the width was twenty-seven inches.

[14] Hicks testified that his opinion was that there was ice in the depression when Terew fell. When asked to describe the basis for his opinion, he testified "[w]e had the rain on February 7 ending in the afternoon," "[s]tarting to freeze three hours later getting down to around 20 degrees at midnight," "then on February 8 the temperatures ranged from 11 degrees to 23 degrees, most cold at night," "February 9 there was no precipitation. Temperatures ranged from 11 degrees to 27 degrees," "then on the morning before she fell it was cloudy the whole morning and the temperature never got above freezing that morning," and "if the sun melted any ice during the day on February 8 or 9 it would have frozen overnight and it would have been ice present on the morning of the eighth and on the morning of the ninth and on the morning of the tenth." Transcript Volume III at 15. When asked "[d]o you have an opinion as to whether or not

Menards should have been aware of the presence of the depression prior or before [Terew's] fall," Hicks answered: "Yes, I think they should have. Those depressions occur over a long period of time, not just overnight and it's right out there next to the cart corral where cart corral guy goes every time he gets carts so they should have been aware that there was a depression there." *Id.* at 16. The court admitted Hicks's report, the weather data, and photographs.

[15] On cross-examination, Hicks indicated that asphalt pavement can develop surface variations over time where cars park and where wheels press down on the pavement. When asked "[y]ou're a hundred percent confident that ice existed in that location from February 7 to February 10," he answered "[y]es." *Id.* at 29. When asked "[a]ll of this weather data came from Weather Underground," he replied affirmatively, and when asked if he had a way of verifying the information on that website, he answered "[n]ot the specific numbers and times, no." *Id.* at 31. Menard's counsel asked "just because it rained at the Indianapolis Airport on February 7 doesn't mean that it rained at the Avon Menard's store," and Hicks answered "[t]hat in itself wouldn't although that's the best information we have." *Id.* at 34. He indicated that his analysis was based on the air temperature and not the surface ground temperature. He indicated that he did not take into consideration any vehicular traffic and did not know how many vehicles would have parked in the space between February 7th and 10th.

[16] Hicks testified regarding his credentials and experience, the information he was provided, his visit to the site of Terew's fall, and his examination of the parking

lot. He was thoroughly cross-examined regarding his investigation, the information upon which he relied, and the basis for his opinion. Based on the record, we cannot conclude the trial court abused its discretion in allowing Hicks's testimony.

II.

[17] Menard further contends the trial court erred in denying its motion to correct error and Terew offered no evidence to justify the multimillion-dollar verdict. It argues Terew stipulated that her total special damages amounted to $40,503.09, she offered no evidence of uncontrolled pain, job loss, or a plan for continuing or future medical care, and the $3.8 million award falls far outside of the parameters of evidence presented. Menard also argues that Terew's counsel "openly speculated about Menards' daily profits," referred to Menard having 2,000 transactions a day, and asked the jury to award Terew a "fair amount" of "$1 for each Menards transaction per day, for her life expectancy of 24.7 years." Appellant's Brief at 45 (citations omitted). Menard asserts that Terew's argument "moved beyond reasonable compensation and into a prohibited punitive purposes argument." *Id.* (internal quotations omitted).

[18] We review a denial of a motion to correct error for abuse of discretion. *Speedway SuperAmerica, LLC v. Holmes*, 885 N.E.2d 1265, 1270 (Ind. 2008), *reh'g denied*. We will look to the evidence and inferences therefrom which support the jury's verdict and will not deem a verdict to be the result of improper considerations unless it cannot be explained on any other reasonable ground.

*See Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 462 (Ind. 2001) (citation omitted). We will vacate an award of damages when it is not rationally related and so great as to clearly indicate that the jury was motivated by prejudice, passion, or partiality or considered an improper element. *State Farm Fire & Cas. Co. v. Radcliff*, 987 N.E.2d 121, 152 (Ind. Ct. App. 2013) (citation omitted), *reh'g denied, trans. denied. See also TRW Vehicle Safety Sys., Inc. v. Moore*, 936 N.E.2d 201, 221-222 (Ind. 2010) (a jury's discretion in making damage award determinations is not limitless and judicial intrusion may be warranted when the amount of damages appears to be so outrageous as to impress the court at first blush with its enormity) (citation and quotations omitted); *Kimberlin v. DeLong*, 637 N.E.2d 121, 129 (Ind. 1994) (a verdict is excessive if it is "so outrageous as to indicate passion, prejudice, or partiality rather than reasoned assessment"), *cert. denied*, 516 U.S. 829 (1995).

[19] Damages in negligence actions are awarded to compensate the injured party fairly and adequately for the loss sustained. *Hi-Tec Properties, LLC v. Murphy*, 14 N.E.3d 767, 775 (Ind. Ct. App. 2014) (citing *Bader v. Johnson*, 732 N.E.2d 1212, 1220 (Ind. 2000)), *trans. denied*. The person injured by the negligence of another is entitled to reasonable compensation. *Id*. Reasonable compensation refers to an amount that would reasonably compensate the plaintiff for bodily injury and for pain and suffering and also takes into account past, present, and future expenses reasonably necessary to the plaintiff's treatment. *Id*. It also includes financial losses suffered or to be suffered by the plaintiff as a result of the inability to engage in his or her usual occupation. *Id*. at 775 n.5.

[20] The record reveals that Stipulated Exhibit 7 provides:

> The parties agree and stipulate to the following facts:
>
> (1) The amount billed to Marilyn Terew for treatment of her injuries totaled $81,240.95; and
>
> (2) Marilyn Terew's medical providers accepted $31,255.50 as full satisfaction for the total billed charges of $81,240.95.

Stipulated Exhibit 7.

[21] Stipulated Exhibit 12 provides:

> The parties agree and stipulate to the following facts:
>
> (1) Marilyn Terew's lost wages for her employment with Kohl's Department Store due to the injuries from her fall at the Menards Avon store parking lot total $2,420.00.
>
> (2) Marilyn Terew's lost wages/benefits for her employment at Tri-West High School due to her injuries from her fall at the Menards Avon store parking lot total $6,827.59

Stipulated Exhibit 12.

[22] Terew indicated that she stopped taking a narcotic pain reliever in approximately March 2019 and that since then, if she needs pain relief, she takes Ibuprofen once a day. She also testified that she returned to her teaching position full-time in April 2019 and returned to her job at Kohl's in May 2019. When asked if Terew's activities have "changed much since her surgery," Bunch stated that "she stays busy, and she does the same things she usually does. Teaching and then she . . . directs the plays at school." Transcript

Volume II at 130. Dr. Tyler J. Beckley, Terew's orthopedic surgeon, discharged Terew in August 2019 and did not place limitations on her activities. Under these circumstances, we conclude Menard demonstrated that the jury verdict of $4 million was excessive and was not based on a reasoned assessment. The Indiana Supreme Court has held: "Upon a claim of excessive or inadequate damages, Indiana Appellate Rule 66(C) authorizes several alternatives, including ordering the entry of judgment of damages in the amount supported by the evidence, App. R. 66(C)(4); ordering a new trial or hearing subject to additur or remittitur, App. R. 66(C)(5); making any relief granted subject to conditions, App. R. 66(C)(9); and granting any other appropriate relief, App. R. 66(C)(10)." *TRW Vehicle Safety Sys., Inc. v. Moore*, 936 N.E.2d 201, 224 (Ind. 2010). *See also* Ind. Trial Rule 59(J) (providing the court, on a motion to correct error, may "(5) In the case of excessive or inadequate damages, enter final judgment on the evidence for the amount of the proper damages, grant a new trial, or grant a new trial subject to additur or remittitur" or "(6) Grant any other appropriate relief, or make relief subject to condition" and "if a new trial is required it shall be limited only to those parties and issues affected by the error unless such relief is shown to be impracticable or unfair"). Given that the evidence regarding Terew's damages including her pain and suffering is unclear, we elect to grant a new trial on the issue of damages.

[23] For the foregoing reasons, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

[24] Affirmed in part, reversed in part, and remanded.

Bailey, J., and Weissmann, J., concur.