**Leif O'CONNELL, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 71S00–9911–CR–665.

Supreme Court of Indiana.

March 2, 2001.

Jeffrey E. Kimmell, South Bend, IN, Attorney for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

BOEHM, Justice.

Leif O'Connell was convicted of one count of murder and five counts of attempted murder and sentenced to 175 years imprisonment in connection with a series of random shootings of African–Americans in St. Joseph County. On direct appeal, O'Connell raises eight issues for review, which we consolidate and restate as four: (1) whether O'Connell waived the right to a court-ordered pretrial lineup and whether the trial court erred in allowing in-court identifications of O'Connell by two victims; (2) whether O'Connell waived any error in allowing the State's surprise witness; (3) whether the evidence was sufficient to convict O'Connell; and (4) whether the trial court erred in imposing consecutive sentences or failed to explain its reasons for imposing them. We affirm the convictions, but remand for a new sentencing order.

**Factual and Procedural Background**

On January 28, 1997, O'Connell and Jerred Kahlenbeck visited the Midwest Gun Exchange store in South Bend where O'Connell made a deposit on a Lorcin .38 semi-automatic pistol. After the waiting period, O'Connell returned on February 11 to purchase the gun.

On February 12, Robert Wardlow was found lying dead in the snow as a result of a gunshot wound to the abdomen. Later that same day, Charles Jackson was shot twice by the driver of a small gray vehicle with one missing headlight. On February 20, John Jones was shot twice in the leg and once in the back as he was walking to a friend's house. In the evening of February 23, Daryl Jennings was shot twice from a vehicle as he sat in his car with some friends. Jennings described the ve-

hicle as a Jeep with a loud muffler, sitting up "higher than usual." Finally, early February 26, John and Michael Reese were walking down the street when Michael noticed a Jeep drive by and its occupants look at them. Michael saw one of the occupants point a gun at John, pushed John out of the way, and was struck by two bullets. All of the victims were African–Americans.

As a result of these incidents, police were alert for both a small gray vehicle with a headlight missing and a Jeep. On February 26, they spotted a Jeep matching Jennings' description. While they were following the Jeep, they received a report of a shooting in the area, pulled the Jeep over, and arrested O'Connell, Kahlenbeck, and Bret Southers. Southers was subsequently released when it was determined that he had been offered a ride home by O'Connell. O'Connell's handgun was located near the area where the Jeep was stopped.

Kahlenbeck was convicted of one count of murder and four counts of attempted murder. At O'Connell's separate trial, Southers testified that O'Connell told him that he was "the one going around doing all these shootings" and would not get caught because "[t]hey think it's a green truck and I drive a Jeep." O'Connell also told Southers that his motive for the killings was revenge for the murder of his girlfriend, who was killed by an African–American. Lila Savage, who was present when O'Connell's girlfriend was murdered, testified that O'Connell had told her in late January or early February that he had bought a gun and wanted to kill people. Finally, Kahlenbeck's sister, Denise Davis, testified that after O'Connell's and Kahlenbeck's arrest, O'Connell telephoned her and told her that he was sorry for getting her brother into trouble. O'Connell told Davis that he was the one responsible for the killings. Shell casings and bullets recovered from the crime scenes and victims were traced to O'Connell's gun. O'Connell was convicted of the murder of Wardlow and the attempted murders of Jackson, Jones, Jennings, and John and Michael Reese.

## I. Identifications

### A. Issues Raised by Pre-trial Identifications

O'Connell sought to suppress testimony of Jackson and Jones that they identified O'Connell from a television broadcast reporting his arrest. Although the trial court denied that motion, it ordered both parties to arrange for a pre-trial lineup. The lineup never occurred and O'Connell now contends that the lineup was essential to impeach Jackson's in-court identification. The State counters that O'Connell never attempted to arrange for a pre-trial lineup and points out that, after O'Connell was independently confronted by Jackson at St. Joseph County Jail, he argued to the trial court that a pre-trial lineup would be tainted. The State argues that this constituted an abandonment of the attempt to orchestrate a pre-trial lineup, and that, in any event, O'Connell did not object to the failure to conduct a pre-trial lineup at the proper time in the proceedings.

We agree with the State that O'Connell abandoned his attempt to have the pre-trial lineup conducted. He made no attempt to ensure that the pre-trial lineup was conducted and raised no objection on this ground until after the State had rested. Once Jackson testified, it would have been impossible for the trial court to cure the alleged failure to conduct a pre-trial lineup. Objections not timely made result in waiver on appeal. *See Etienne v. State*, 716 N.E.2d 457, 461 n. 3 (Ind.1999) (objections to prosecutorial comments came too late to preserve claim of prosecutorial misconduct). In short, O'Connell neither took action to ensure that the lineup would be conducted, nor raised a timely objection to the fact that it was not.[1]

---

1. O'Connell argues in the alternative that trial

counsel was ineffective for failing to ensure

### B. *In-court Identifications*

O'Connell argues that the trial court abused its discretion in allowing in-court identifications of him by Jackson and Jones because the identifications were the result of an unnecessarily suggestive pretrial procedure engineered by the State.

■ A conviction "based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In order to succeed on this argument, the defendant must demonstrate that law enforcement personnel or the prosecutors were responsible for the unnecessarily suggestive identification procedure. *Robertson v. State,* 429 N.E.2d 258, 259–60 (Ind.1981). A witness' viewing of a suspect's photograph through the media does not ordinarily constitute an impermissibly suggestive identification procedure because it is not engineered by prosecution or law enforcement agencies. *Norris v. State,* 265 Ind. 508, 512–13, 356 N.E.2d 204, 206 (1976).

■ O'Connell maintains that by holding a press conference and releasing a photo of him as a suspect in the murders, the State engineered Jones' and Jackson's identifications of O'Connell. O'Connell also notes that the police never attempted to have Jackson or Jones identify O'Connell from a lineup or photo array. The State responds by pointing out that, in *Norris,* this Court distinguished the publication of photographs in a newspaper from a situation where police show the photo to the witness. 265 Ind. at 512 n. 2, 356 N.E.2d at 206 n. 2. One can imagine an orchestrated prompting of a witness by means of the media. But in this case, the trial court concluded that "[t]here is no evidence from which the court may conclusively find that the prosecution had any role in disseminating pictures to the media." In the absence of that showing, O'Connell lacks even the tenuous link to prosecutorial activity that he alleges.

### II. Surprise Witness

Denise Davis, Kahlenbeck's sister, testified that O'Connell contacted her after he was arrested and told her he was sorry he had gotten Kahlenbeck in trouble and that O'Connell, not Kahlenbeck, was responsible for the crimes. O'Connell contends that the trial court abused its discretion by allowing Davis' testimony because she was not identified as a witness until after the trial had begun. The State responds that Davis did not come forward until after trial had started and there was no effort to conceal her from the defense.

■ When a defendant is confronted with a surprise witness, ordinarily the proper response is to move for a continuance. *Siblisk v. State,* 263 Ind. 651, 656, 336 N.E.2d 650, 653 (1975). This remedy allows time for the opposing party to depose the witness and examine the accuracy of the proposed testimony. The failure to move for a continuance may waive any alleged error on appeal. *Id.*

■ Here, over O'Connell's objection, the trial court ruled that Davis would be permitted to testify. Rather than move for a continuance, O'Connell requested that he be allowed to depose Davis. This request was granted, and O'Connell did

---

that the pre-trial lineup was conducted. O'Connell contends that "[w]ithout the in-court identifications, the outcome of counts I, II, III, and IV would have been not guilty due to an insufficiency of evidence." Although we think counsel's performance did not fall below prevailing norms when he concluded that a pre-trial lineup after Jackson's jailhouse identification of O'Connell would serve only to bolster Jackson's earlier identification, in view of the other evidence discussed in Part III, lack of prejudice from this judgment is even clearer. *See Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

not renew his objection when Davis testified. Under these circumstances, O'Connell has waived this issue, *see id.*, which, if there is no state involvement in suppressing the witness, appears to have no merit.

## III. Sufficiency of the Evidence

 Our standard of review for sufficiency claims is well settled. We do not reweigh evidence or assess the credibility of witnesses. Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict and will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Taylor v. State,* 681 N.E.2d 1105, 1110 (Ind.1997).

O'Connell argues that there was insufficient evidence to convict him of the murder of Wardlow and the attempted murders of Jackson, Jones, Jennings, and John Reese. The only conviction he does not challenge on the basis of sufficiency is the attempted murder of Michael Reese.

### A. Murder of Wardlow and Attempted Murders of Jackson, Jones, and Jennings

 O'Connell argues that the only persuasive evidence of his guilt for the murder of Wardlow is the eyewitness testimony of Jackson, which he claims is "dubious" given that Jackson was exposed to media accounts before he identified O'Connell. By O'Connell's own account, the evidence the jury considered in convicting him of the murder of Wardlow consisted of the following. O'Connell purchased a gun shortly before Wardlow's death and a bullet fired from this gun was recovered from Wardlow's body. Jackson, who was shot the same night as Wardlow, identified O'Connell as a passenger in Kahlenbeck's

car when Kahlenbeck shot him. Lila Savage testified that O'Connell felt like killing someone and Southers testified that, on the night of O'Connell's arrest, O'Connell said he was the one "going around shooting people." Finally, O'Connell apologized to Davis for getting her brother, Kahlenbeck, into trouble. In addition, at trial, evidence was presented that the murder of Wardlow and the attempted murders of the others were part of O'Connell's plan to shoot African–Americans to avenge his girlfriend's murder. This evidence was sufficient to support O'Connell's conviction of the murder of Wardlow.

Much of this evidence also bore on O'Connell's guilt in the attempted murders of Jackson, Jones, and Jennings. In short, eyewitness testimony confirming O'Connell's involvement, ballistics evidence confirming that O'Connell's gun was the weapon used in the attempted murders, and the testimony of three witnesses to whom O'Connell personally claimed responsibility for "all the shootings" provide more than sufficient evidence from which a reasonable jury could have concluded O'Connell was guilty beyond a reasonable doubt of the attempted murders of Jackson, Jones, and Jennings.

### B. Attempted Murder of John Reese

 O'Connell contends that there was insufficient evidence presented to convict him of the attempted murder of John Reese, contending that: "While a reasonable juror could have concluded that Appellant aided in the attempted murder of Michael Reese based on the theory of transferred intent, this theory would not support a guilty finding for the Attempted Murder of John Reese, who was not injured at all."[2] O'Connell was sentenced

---

**2.** O'Connell has formulated his argument as an attack on the trial court's refusal to grant O'Connell's motion to dismiss the count for the attempted murder of John Reese prior to trial and at the close of the State's case. O'Connell cites no authority for the proposition that the trial court erred in refusing to

grant his motions. Rather, O'Connell cites to cases dealing primarily with double jeopardy concerns, but argues that "a reasonable juror could [not] have concluded that Appellant aided in the attempted murder of … John Reese, who was not injured at all." These cases notwithstanding, at base, his argument

concurrently for the attempted murder of John Reese, but nevertheless challenges this conviction, urging that the case be "remanded for resentencing in consideration of the absence of this conviction." O'Connell relies on *Nunn v. State*, in which the Court of Appeals vacated a defendant's convictions for four counts of attempted murder where the defendant had fired five shots at a single victim. 695 N.E.2d 124, 124–25 (Ind.Ct.App.1998). O'Connell's reliance on *Nunn* is misplaced and his argument without merit. O'Connell's six counts were based on five separate incidents and six different victims. Even as to the two victims in one incident, Southers testified that Kahlenbeck fired two shots "[a]t the two people." This is sufficient evidence for a jury to conclude beyond a reasonable doubt that Kahlenbeck harbored the specific intent to kill both Michael and John Reese and that O'Connell was guilty of the attempted murder of both, as well as the shootings of the other four victims.

## IV. Alleged Sentencing Violations

### A. *Consecutive Sentencing*

■ O'Connell alleges that the trial court erred in imposing consecutive sentences because this Court had already determined in *Kahlenbeck v. State* that the offenses for which O'Connell was convicted "were based on 'a series of acts ... constituting part of a single scheme or plan.'" 719 N.E.2d 1213, 1215–16 (Ind.1999) (quoting Ind.Code § 35–34–1–9 (1998)). O'Connell urges that this holding has become the "law of the case."

The ruling in *Kahlenbeck* on which O'Connell relies did not relate to sentencing. Kahlenbeck argued that the trial court had erred in denying his motion to sever the six counts with which he was charged. He challenged the trial court's refusal to sever based on Indiana Code section 35–34–1–11(a), which provides a defendant the right to severance under certain circumstances, none of which is a trig-

ger of the consecutive sentencing statute. *Kahlenbeck*, 719 N.E.2d at 1215–16. The legislature has provided that, except for crimes of violence, the imposition of consecutive sentences for convictions "arising out of an episode of criminal conduct shall not exceed the presumptive sentence for a felony which is one (1) class of felony higher than the most serious of the felonies for which the person has been convicted." Ind.Code § 35–50–1–2(c) (1998). O'Connell maintains that his convictions arise out of a single "episode of criminal conduct." The legislature has defined an "episode of criminal conduct" as "offenses or a connected series of offenses that are closely related in time, place, and circumstance." *Id.* § 35–50–1–2(b). This Court recently concluded that attempted murder is not a crime of violence under the current statutory scheme, even though murder is. *Ellis v. State*, 736 N.E.2d 731, 736–37 (Ind.2000). Thus, if O'Connell's multiple shootings were part of a single episode of criminal conduct, his sentences for the attempted murders must be capped at fifty-five consecutive years beyond his sentence for murder.

■ Although this Court has seldom had occasion to address what constitutes an episode of criminal conduct, the Court of Appeals has defined an "episode" as:

an occurrence or connected series of occurrences and developments which may be viewed as distinctive and apart although part of a larger or more comprehensive series[, including] the simultaneous robbery of seven individuals, the killing of several people with successive shots from a gun, [or] the successive burning of three pieces of property....

*Tedlock v. State*, 656 N.E.2d 273, 276 (Ind. Ct.App.1995) (quoting 2 ABA, *Standards for Criminal Justice* § 12–2.2(a) (1980)); *accord Flynn v. State*, 702 N.E.2d 741, 748–49 (Ind.Ct.App.1998). The issue is whether "the alleged conduct was so closely related in time, place, and circumstances

appears to raise a sufficiency claim and we address it as such.

that a complete account of one charge cannot be related without referring to details of the other charge." *Flynn,* 702 N.E.2d at 748–49; *Tedlock,* 656 N.E.2d at 276 (citations omitted).

Here, O'Connell hatched a plan to shoot at random, innocent persons because they were African–Americans. O'Connell professes to be "baffled" as to how he could be forced to defend himself in a single trial and nevertheless receive consecutive sentences. We are not. O'Connell's "single" plan involved the attempted murder of several people and the murder of another on different days over a span of two weeks. These events do not constitute a single criminal episode and are easily alleged without reference to the details of the others. In simple terms, the holding that Kahlenbeck was not entitled to severance was based on statutory criteria that are inapplicable to the consecutive sentencing statute. The trial court did not err in sentencing O'Connell to consecutive terms for his convictions.[3]

### B. *The Sentencing Statement*

O'Connell argues that the trial court failed to explain adequately its reasons for imposing consecutive sentences on Counts I–VI.[4]

 It is well established that sentencing decisions lie within the discretion of the trial court, *Harris v. State,* 659 N.E.2d 522, 527–28 (Ind.1995), including the decision to enhance a presumptive sentence or to impose consecutive sentences, *McCollum v. State,* 582 N.E.2d 804, 817 (Ind.1991). In order to impose consecutive sentences, the trial court must find at least one aggravating circumstance. *Marcum v. State,* 725 N.E.2d 852, 864 (Ind.2000). If the court finds an aggravating circumstance, it is required to make "a statement

of the court's reasons for selecting the sentence that it imposes." Ind.Code § 35–38–1–3 (1998); *accord Widener v. State,* 659 N.E.2d 529, 533 (Ind.1995). This statement must include: (1) the identification of all significant mitigating and aggravating circumstances; (2) the specific facts and reasons that led the court to find the existence of each such circumstance; and (3) reflection of an evaluation and balancing of the mitigating and aggravating circumstances in fixing the sentence. *Widener,* 659 N.E.2d at 533.

 The trial court's sentencing statement read as follows:

[T]he Court now finds that aggravating circumstances exist, particularly in the nature and circumstances of the crimes committed, the various factors listed by the State that fall under that category. On the other hand, the Court believes that there are mitigating circumstances, first of all in that the crimes were the result of circumstances unlikely to recur in Mr. O'Connell's life, and that there are substantial grounds tending to excuse the actions of the defendant only in the sense of his mental state following the death of his girlfriend. In any event, the Court believes that the aggravating and mitigating circumstances do offset each other and that the Court should impose presumptive terms on these crimes. The Court further finds that these are separate events, and the Court does believe that under the Indiana sentencing scheme, or guidelines set by our legislature, that most of those should not be sentenced as concurrent sentences.

Accordingly, upon Count I, the Court sentences the defendant to fifty-five years.... On Count II, the Court will impose the presumptive sentence of thir-

---

3. The only convictions that might be said to have arisen out of a single episode are those for the attempted murder of Michael and John Reese. This raises no issue because the trial court ordered those sentences to be run concurrently.

4. Count I was the murder of Wardlow. Counts II–VI were the attempted murders of Jackson, Jones, Jennings, and Michael and John Reese, respectively.

ty years which will be consecutive to Count I; on Count III, the Court will impose the presumptive sentence of thirty years, consecutive to Counts I and II; on Count IV, the Court will impose the presumptive sentence of thirty years, consecutive to Counts I, II, and III. And the Court will further find that Counts V and VI were the same incident, and will impose sentences on each of those counts of the presumptive thirty years, which are consecutive to the preceding counts, but are concurrent to each other.

O'Connell challenges the sufficiency of the statement in its articulation of the aggravating circumstances and its alleged reliance on a "mistaken impression that under sentencing law the sentences should be consecutive." The trial court did not articulate which aggravating circumstances it weighed the most heavily. The trial court found the nature and circumstances of the crime to be aggravating and relied on the specific aggravating circumstances presented by the State that related to that statutory factor. The State's list proposed seven aggravating circumstances: (1) the motivations behind the shootings; (2) there were multiple victims; (3) premeditation was involved in committing the crime; (4) the crimes involved the indiscriminate firing of a gun "without regard to anyone else"; (5) four of the victims were shot multiple times; (6) Jones was permanently disabled as a result; and (7) the crimes involved the use of a handgun. This undifferentiated incorporation gives us little if any guidance as to the trial court's reasoning.

■ The trial court found the mitigating and aggravating circumstances to be in balance. Because mitigating factors were

found, this result makes clear that the court considered aggravating circumstances in reaching the result, but does not permit meaningful review. The trial court stated that imposing consecutive sentences was "consistent with our state's sentencing scheme," emphasizing that the offenses were separate incidents. It is unclear whether the trial court incorrectly assumed that it was required to impose consecutive sentences, or whether it was simply recognizing that a common basis for imposing consecutive sentences is that there are multiple crimes involved or multiple victims. It is a well established principle that the fact of multiple crimes or victims constitutes a valid aggravating circumstance that a trial court may consider in imposing consecutive or enhanced sentences. *Noojin v. State,* 730 N.E.2d 672, 679 (Ind.2000); *Sanquenetti v. State,* 727 N.E.2d 437, 443 (Ind.2000); *Little v. State,* 475 N.E.2d 677, 686 (Ind.1985) (holding that there was no error in the imposition of consecutive sentences where "trial court segregated the crimes committed against each rape victim and considered the fact that this defendant had committed two separate crimes against two different victims"). Here, because the order does not set forth the trial court's basis for O'Connell's sentence, a new sentencing order is required.[5]

■ As in this case, this Court occasionally remands criminal cases to trial courts for new sentencing orders. Unless this Court specifically directs otherwise, a trial court's responsibility in that circumstance is to produce a new sentencing order that responds to the concerns this Court has raised. Depending upon the nature of those concerns, this responsibility may be discharged by the trial court (1)

**5.** O'Connell's argument that due process was offended by his sentencing proceeding is without merit. O'Connell relies on *Townsend v. Burke,* 334 U.S. 736, 740–41, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948), in which a defendant was sentenced based upon mistaken material assumptions as to his criminal record. This was held to be a violation of his due process

rights. O'Connell does not allege that the trial court was acting under any misinformation in its sentencing and there is no evidence in the record that it did so. Thus, this claim fails. We do not address O'Connell's contention that his sentence is manifestly unreasonable because we remand to the trial court for a new sentencing order.

issuing a new sentencing order without taking any further action; (2) ordering additional briefing on the sentencing issue and then issuing a new order without holding a new sentencing hearing; or (3) ordering a new sentencing hearing at which additional factual submissions are either allowed or disallowed and then issuing a new order based on the presentations of the parties.

## Conclusion

The convictions are affirmed and the case is remanded for a new sentencing order.

SHEPARD, C.J., and DICKSON, SULLIVAN, and RUCKER, JJ., concur.