**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 30 2013, 7:32 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DAVID W. STONE IV**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MARTEZ BROWN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 48A02-1212-CR-1007 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MADISON CIRCUIT COURT
The Honorable David A. Happe, Judge
Cause No. 48C01-1012-MR-783

**July 30, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

Martez Brown and two friends decided to rob a known drug dealer at his home in the middle of the night at gun point.  The drug dealer and his girlfriend were shot and killed, and the trio left the house with thousands of dollars, drugs, and other property. Following a bench trial, Brown was convicted of two counts of murder and one count of Class B felony robbery for his role in the crimes and sentenced to 150 years.  Brown now appeals arguing that the evidence is insufficient to support his murder convictions as an accomplice, the trial court abused its discretion in finding five aggravators, and his sentence is inappropriate in light of the nature of the offenses and his character.  We find that the evidence is sufficient to support Brown's murder convictions as an accomplice, the trial court did not abuse its discretion in finding the five aggravators, and Brown has failed to persuade us that his 150-year sentence is inappropriate in light of the heinousness of the crimes and Brown's poor character.  We therefore affirm the trial court.

**Facts and Procedural History**

It was no secret that Stephen Streeter made his money selling marijuana and had done so for five years.  Stephen dated Keya Prince, and the two of them lived at 2308 Menifee Street in Anderson, Indiana.  People regularly visited the house on Menifee Street to purchase marijuana from Stephen, often in cash.  Stephen owned two handguns, a 9 mm and a .40 caliber.  Stephen also had an X-box and two large flat screen televisions in the house on Menifee Street.

Around Thanksgiving 2010, Stephen had approximately $25,000 in cash. On the Friday after Thanksgiving—November 26—Therron Ivey spent the day at Stephen and Keya's house playing X-Box with Stephen, leaving around 8:00 p.m. Also on the evening of November 26, Stephen and Keya's neighbor, Mary Barclay, texted Keya and asked her to check on her children, who were home next door with her brother. Keya responded that she would check on Mary's children and then text her back. Keya, however, never texted Mary back. When Mary got home around 1:30 a.m. on Saturday, she called and texted Keya again, but Keya did not respond. Mary went to Stephen and Keya's house numerous times, but there was never any response. Stephen and Keya's cars were in the driveway, though.

On Monday, November 29, 2010, police were called to 2308 Menifee Street for a welfare check. When Anderson Police Department Officer Paul Parks arrived at the house, several concerned family members were present. Officer Parks requested backup, and Officer Mark Dawson arrived. The officers knocked on the front door several times, but there was no response. The officers walked around the house, checking windows as they went. They eventually came across a window that was slightly ajar and looked in. They saw a person lying in a bed facedown and yelled, but again they received no response. The officers also smelled "an odor . . . associate[d] with . . . [a] decaying body." Tr. p. 84. The officers called their sergeant to see if they could enter the house. After receiving permission, the officers kicked in the locked front door. They went directly to the bedroom where they had seen the person in the bed and saw blood around

3

the person's head. Suspecting a homicide, the officers secured the scene and called for detectives.

Detectives discovered and identified the bodies of Stephen and Keya. Stephen was on the bed, and Keya was on the floor next to the bed against a wall. According to Detective Jake Brooks, as soon as he walked into the house, he smelled an odor of "decaying body." *Id.* at 95. Stephen was "a little bit decomposed," while Keya was "less decomposed." *Id.* at 168. Stephen had been shot in the back of the head, and Keya had been shot in the chest. The forensic pathologist who performed the autopsies estimated the date of death to be November 27 or 28 based on the decomposition of the bodies. *Id.* at 178.

In the meantime, a crowd of "[s]everal hundred" people gathered outside Stephen and Keya's house. *Id.* at 94. They were angry, upset, crying, yelling, and trying to get inside. Every officer assigned to second shift was sent to 2308 Menifee Street to contain the crowd, which included physically restraining some of the people and arresting others.

When police processed the scene, two televisions and a game system were missing from the house. Also, only one of Stephen's two guns was found.

Tips started coming in from Crime Stoppers, and within ten hours of the bodies being found, Detective Brooks had the names of Jacob Fuller, Na-Son Smith, and sixteen-year-old Brown as persons of interest in this case.[1]

On the morning of Saturday, November 27—before Stephen's and Keya's bodies were found—Jacob, Na-Son, and Brown brought two flat-screen televisions, an X-Box,

---

[1] Na-Son Smith and Jacob Fuller were each sentenced to 150 years for their roles in these crimes. *See Smith v. State*, Cause No. 48A02-1210-CR-872 (Ind. Ct. App. July 25, 2013), and *Fuller v. State*, Cause No. 48A02-1210-CR-848 (Ind. Ct. App. July 10, 2013).

and a couple of shoe boxes to Felisha Grant's home and left them there. But after Felisha learned about the murders, she "told them to come and get they [sic] stuff. Cause I didn't want nothing to do wit [sic] it." *Id.* at 105.

In the early morning hours of Tuesday, November 30, Theodore Chilton, who lived at 1417 Arrow Avenue in Anderson and was getting ready to go to work, called 911 to report that he had just observed two young black males throw a black semi-automatic handgun into his next door neighbor's yard. At about the same time, Officer Ian Spearman was patrolling the area and stopped two young black males, later identified as Jacob and Na-Son, for a curfew violation. Officer Spearman was advised through dispatch to use extreme caution when dealing with Jacob and Na-Son because someone had just reported that two young black males had thrown a handgun into a nearby yard. Police took Jacob and Na-Son into custody and found the handgun in the front yard of 1415 Arrow Avenue. The handgun was later determined to have fired a shell casing and a projectile recovered from the crime scene at 2308 Menifee Street as well as the bullet recovered from Keya's body. *Id.* at 234-35. Jacob's fingerprint was lifted from the magazine recovered from the handgun. *Id.* at 313.

Brown sold a 9 mm handgun to Josh Steele for $200. Josh sold the gun to someone else, who then sold it to Rayshawn Ross on November 29, which was "[t]he day that they found out the bodies was [sic] in the house." *Id.* at 301. At the urging of his aunt, Rayshawn turned the gun over to the police because he figured that it was the gun taken from Stephen and Keya's house during the robbery. *Id.* at 300.

Approximately one week after the bodies were found, police executed a search warrant at Brown's residence. Brown, his mother, and his sister were present at the time. When Brown was taken into custody, he had a different 9 mm handgun on his person; Brown later explained during his interview with police that this was the same gun that he used during the robbery at Stephen and Keya's house. Also during the interview, Brown exhibited knowledge of the crime scene that police had not yet shared with the public, such as the location and position of the bodies, the location of the gunshot wounds, and how much money was taken. *Id.* at 363, 367. After initially denying any involvement in the murders, Brown eventually told police that he, Jacob, and Na-Son went to Stephen's house to rob him on late Friday night/early Saturday morning; Jacob drove the trio there. They targeted Stephen because they had heard about him. State's Ex. 172, p. 24. When they got to the house, they "rushed in." *Id.* All three of them had guns—Brown had a 9 mm, Na-Son had a shotgun, and Jacob had a .40 caliber. Brown had his gun "behind [his] back, like over on the side." *Id.* at 41. They rushed Stephen to the ground and tied him up. *Id.* at 26. Then, they grabbed Keya, who had emerged after hearing all the noise. When the detective asked Brown what they did next with Stephen and Keya, Brown responded, "Killed both of them." *Id.* Brown said that while he was "looking for money and the bud," *id.* at 29, he heard a gunshot—Jacob had shot Keya. Brown explained his reaction as follows, "I jumped a little bit. Then Na-Son looked at me, the look in his eyes was seeing like it was on, and my heart dropped. So then it just happened." *Id.* at 27. When Stephen heard the gunshot, he jumped. Na-Son ordered Stephen to the bed to "[s]how him some love" and so that he could "rest in peace" and then shot him in the

6

back of the head. *Id.* at 79; *see also id.* at 26. According to Brown, they grabbed "all the stuff [they] could grab and then vanished out." *Id.* at 27. When asked how long he was inside the house, Brown quipped, "[N]ot that long. I was in and out. 'Cause I'm the come in quick type." *Id.* at 44. Brown kept $7000 for himself. They also took several pounds of marijuana, a 9 mm handgun, two televisions, a Wii, and an X-Box. When asked why Jacob and Na-Son shot Stephen and Keya, Brown explained that they were afraid they would be recognized. *Id.* at 36. At the time of the interview, Brown had already spent his $7000 on two trips to Walmart and the mall. He also bought a $1000 necklace in Indianapolis.

Police retrieved surveillance video from Walmart from Saturday, November 27. Dottie Hart, who works in asset protection, noticed the three men depicted on the store's surveillance video acting obnoxious in the store. Dottie recognized Jacob, who had a "wad of money" that included $100 bills. Tr. p. 289. Police also obtained photographs from Jacob's and Na-Son's cell phones showing Brown, Jacob, and Na-Son holding up large amounts of money, fanning out the bills. State's Ex. 157(a).

The State charged Brown in adult court with two counts of murder, Class A felony robbery, Class A felony burglary, and Class D felony theft. The State later requested a sentence of life imprisonment without parole. Eventually, Brown waived jury trial, and a bench trial was held in late October-early November 2012. The State's theory was that although Brown did not pull the trigger, he was an accomplice to the murders of Stephen and Keya. Tr. p. 409. At the conclusion of the evidence, the State dismissed the burglary charge as well as its request for LWOP. The trial court found Brown guilty of the

7

remaining charges. A sentencing hearing was held. The court reduced Brown's robbery conviction to a Class B felony because of double-jeopardy concerns and did not enter judgment for theft because it found that it merged with robbery. The court identified five aggravators, most of which the court found to be "powerful": (1) Brown's criminal history; (2) Brown conspired with Jacob and Na-Son to commit the offenses; (3) multiple deaths were caused; (4) the offenses were committed in the presence of a person under the age of eighteen (but the trial court gave this aggravator little weight because it was a member of the trio, Jacob, who was under the age of eighteen); and (5) Brown recently violated the conditions of his probation. *Id.* at 430; Appellant's App. p. 8. The court identified two mitigators: (1) Brown's young age and (2) Brown engaged in limited cooperation with law enforcement by providing a statement. Appellant's App. p. 8. Concluding that the aggravators "powerfully" outweighed the mitigators, the court sentenced Brown to sixty-five years for each murder conviction and twenty years for robbery, to be served consecutively, for an aggregate term of 150 years. Tr. p. 431; Appellant's App. p. 8.

Brown now appeals.

**Discussion and Decision**

Brown raises three issues on appeal. First, he contends that the evidence is insufficient to support his murder convictions as an accomplice. Second, he contends that the trial court abused its discretion in finding all five aggravators. Last, he contends that his sentence is inappropriate.

**I. Sufficiency of the Evidence**

8

Brown contends that the evidence is insufficient to support his murder convictions as an accomplice. When reviewing a challenge to the sufficiency of the evidence underlying a criminal conviction, we neither reweigh the evidence nor assess the credibility of witnesses. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012). The evidence—even if conflicting—and all reasonable inferences drawn from it are viewed in a light most favorable to the conviction. *Id.* "[W]e affirm if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Id.*

To be convicted of murder as an accomplice, the defendant must knowingly or intentionally aid, induce, or cause the commission of a murder by another. Ind. Code § 35-41-2-4. A defendant may be charged as the principal but convicted as an accomplice. *Castillo v. State*, 974 N.E.2d 458, 466 (Ind. 2012). Generally, there is no distinction between the criminal liability of an accomplice and a principal, although evidence that the defendant participated in every element of the underlying offense is not necessary to convict a defendant as an accomplice. *Id.* "There is no bright line rule in determining accomplice liability; the particular facts and circumstances of each case determine whether a person was an accomplice." *Id.* (quotation omitted). We consider four factors to determine whether a defendant acted as an accomplice: (1) presence at the scene of the crime; (2) companionship with another at scene of crime; (3) failure to oppose commission of crime; and (4) course of conduct before, during, and after occurrence of crime. *Id.* That a defendant was present during the commission of a crime and failed to oppose the crime is not sufficient to convict him. *Id.* But "presence at and acquiescence

9

to a crime, along with other facts and circumstances," may be considered. *Id.* (quotation omitted).

Brown argues that the trio's plan was to rob "a drug dealer" and that there was "no reason for [him] to anticipate that [Jacob] and [Na-Son] would kill [Stephen] and [Keya] for no discernible reason." Appellant's Br. p. 7-8. Brown also argues that a "double murder is not the probable and natural consequence of the common plan to commit robbery." *Id.* at 8. Accomplice liability applies to the contemplated offense and all acts that are a probable and natural consequence of the concerted action. *Kendall v. State*, 790 N.E.2d 122, 131 (Ind. Ct. App. 2003), *trans. denied*. Thus, the accomplice is liable "for everything . . . which follows incidentally in the execution of the common design, as one of its natural and probable consequences, even though it was not intended as part of the original design or common plan." *Id.* at 132 (quotation omitted).

We find that the evidence establishes that the murders of Stephen and Keya were indeed the natural and probable consequences of the trio's plan to rob Stephen. The record shows that the trio, each armed with a gun, went to the home of a known drug dealer in the middle of the night and rushed the front door to gain entry. After restraining Stephen, they grabbed Keya. When police asked Brown what they did next with Stephen and Keya, Brown callously responded, "Killed both of them." State's Ex. 172, p. 26. Brown said that he was searching for money and drugs when Jacob shot Keya. Na-Son then gave Brown the look like "it was on," *id.* at 27, at which point Stephen was ordered to the bed and shot by Na-Son in the back of his head. Brown said that Keya and Stephen were killed because they were afraid they would be identified. The trio then took

10

everything that they could from the house and left. After Brown counted and flaunted his $7000 in cash, Brown went shopping and spent the money within a week. Brown also sold the gun they took from Stephen's house.

The facts of this case are readily distinguishable from *Kelly v. State*, 719 N.E.2d 391 (Ind. 1999), *reh'g denied*, upon which Brown relies on appeal. In *Kelly*, our Supreme Court affirmed the trial court's grant of judgment on the evidence for one of the defendant's three murder convictions because the evidence showed that the defendant left the scene before the third victim was shot and there "was a complete lack of evidence that the confrontations and murder were anything other than spontaneous and 'spur of the moment.'" *Id.* at 396. In contrast, this case involved a planned and armed home robbery of a known drug dealer, and Keya and Stephen were shot while Brown was actively participating in the robbery. Contrary to Brown's argument, the murders in this case were not spur-of-the-moment killings, *see* Appellant's Br. p. 8; rather, they were the natural and probable consequence of a planned and armed home robbery of a known drug dealer. The evidence is sufficient to support Brown's convictions for the murders of Stephen and Keya under accomplice liability.

## II. Abuse of Discretion

Brown challenges all five aggravators identified by the trial court. Sentencing decisions rest within the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007). So long as the sentence is within the statutory range, it is subject to review only for an abuse of discretion. *Id.* An abuse of discretion will be found where the decision is clearly against

11

the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.*

A trial court may abuse its discretion in a number of ways, including: (1) failing to enter a sentencing statement at all; (2) entering a sentencing statement that includes aggravating and mitigating factors that are unsupported by the record; (3) entering a sentencing statement that omits reasons that are clearly supported by the record; or (4) entering a sentencing statement that includes reasons that are improper as a matter of law. *Id.* at 490-91. Because the trial court no longer has any obligation to weigh aggravating and mitigating factors against each other when imposing a sentence, a trial court cannot now be said to have abused its discretion in failing to properly weigh such factors. *Id.* at 491.

Brown first argues that the trial court abused its discretion in finding his criminal history as an aggravator. A defendant's history of juvenile adjudications is a proper aggravating circumstance. *Sexton v. State*, 968 N.E.2d 837, 841 (Ind. Ct. App. 2012), *reh'g denied*, *trans. denied*. The record shows that Brown committed his first delinquent act in December 2006 at the age of twelve—Class D felony criminal mischief if committed by an adult—and committed the murders and burglary in this case in November 2010 at the age of sixteen. During the intervening years, Brown amassed a lengthy juvenile record. On June 12, 2007, Brown was arrested for Class D felony theft and pleaded guilty to Class A misdemeanor criminal conversion. Brown was again arrested on July 28, 2007, for Class D felony theft; this was reduced to Class A misdemeanor criminal conversion and disposed of through the same plea agreement as

12

above. On May 21, 2008, the prosecutor referred Brown to probation for Class D felony criminal trespass. Also on May 21, 2008, Brown was again arrested for Class D felony theft. The allegation was found true, and Brown was ordered to spend thirty days in secure detention. On July 25, 2008, Brown was yet again arrested for Class D felony theft. A true finding was entered for the reduced charge of Class A misdemeanor criminal conversion, and Brown was continued on probation.

On January 5, 2009, Brown was arrested for Class B felony robbery resulting in bodily injury and two counts of Class A misdemeanor battery resulting in bodily injury. On April 24, 2009, pursuant to a plea agreement, a true finding was entered for Class D felony theft as a reduced charge to robbery and both batteries as charged. Brown was ordered to participate in the Madison County Youth Center Day Treatment/Day Reporting Program. Just five days after this judgment, Brown was arrested for Class B felony burglary and Class D felony theft. A true finding was entered for both counts, and Brown was placed in the Youth Opportunity Center as well as on supervised probation. On November 12, 2010, a true finding was entered against Brown for Class A misdemeanor possession of marijuana, and he was ordered to attend substance-abuse counseling. On November 23, 2010, Brown was arrested for a litany of offenses, and he eventually pleaded guilty to Class A misdemeanor resisting law enforcement, Class B misdemeanor reckless driving, and Class C misdemeanor operating a motor vehicle without ever receiving a license. In February 2011, Brown was charged with several crimes that were committed on Friday, November 26, 2010, which is the same night that Jacob, Brown, and Na-Son committed the crimes in this case. Brown eventually pleaded

13

guilty to Class B felony burglary and was sentenced to the Department of Correction for six months. While incarcerated in the Madison County Jail awaiting trial in this case, Brown committed three conduct violations for possession of a weapon or anything that can be used as a weapon; destroying, damaging, or defacing jail property; and possession of unauthorized items. In the PSI, Brown's overall risk assessment score put him in the "VERY HIGH" risk category to reoffend. Appellant's App. p. 66b.

Brown nevertheless argues that "[f]or purposes of sentencing for 2 murders and robbery [Brown's] unrelated juvenile offenses do not justify the maximum sentence which was imposed." Appellant's Br. p. 10. We disagree. Brown's juvenile history shows a steady and unabated path from violating people and their property to murdering Stephen and Keya and taking cash, drugs, and other property from their home. The trial court did not abuse its discretion in identifying Brown's criminal history as an aggravator.

Brown next argues that the trial court abused its discretion in finding multiple victims as an aggravator because the "fact that two people were killed is a material element of the crimes of two murders." Appellant's Br. p. 10-11. Brown's argument is misplaced. It is well settled that multiple victims constitute a valid aggravating circumstance that a trial court may consider in imposing consecutive or enhanced sentences. *O'Connell v. State*, 742 N.E.2d 943, 952 (Ind. 2001); *see also Serino v. State*, 798 N.E.2d 852, 857 (Ind. 2003) ("[W]hen the perpetrator commits the same offense against two victims, enhanced and consecutive sentences seem necessary to vindicate the

14

fact that there were separate harms and separate acts against more than one person.").
Accordingly, the trial court did not abuse its discretion in finding this aggravator.

Brown next argues that the trial court abused its discretion in finding as an aggravator that Brown committed the offense in the presence of a person less than eighteen years old. Indiana Code section 35-38-1-7.1(a)(4) provides that the trial court may consider as an aggravator that the person:

> (A) committed a crime of violence (IC 35-50-1-2); and
> (B) knowingly committed the offense in the presence or within hearing of an individual who:
>> (i) was less than eighteen (18) years of age at the time the person committed the offense; and
>> (ii) is not the victim of the offense.

One of the purposes of this statute is that society wants to guard against having juveniles involved in crimes. *See Patterson v. State*, 846 N.E.2d 723, 729 (Ind. Ct. App. 2006). Brown argues that because Section 35-18-1-7.1(a)(4) "does not address crimes committed by two minors," it does not apply here. Appellant's Br. p. 11. To the contrary, by expressly excepting victims of the offense but establishing no age requirement for the defendant, we find that this section squarely applies to the facts of this case. *See also Patterson*, 846 N.E.2d at 728-29 (finding that the trial court did not abuse its discretion in finding as an aggravator that the defendant was eighteen when he committed murder in the course of a robbery with his fourteen-year-old accomplice). Moreover, the trial court gave this aggravator little weight because the person under age eighteen, Jacob, was Brown's accomplice. Tr. p. 430. The trial court did not abuse its discretion in identifying as an aggravator that Brown, although a minor himself, committed the crimes in the presence of one of his accomplices who was also a minor.

15

Brown next argues that the trial court abused its discretion in finding as an aggravator that he had recently violated his probation. Brown argues that he was placed on probation on June 19, 2009, but the record "does not state how long he was placed on probation." Appellant's Br. p. 12. The record, however, shows that Brown was referred to probation in September 2010 for a curfew violation and for two cause numbers involving adjudications from 2008, Brown was not released from probation until May 11, 2011—well after the events in this case. Appellant's App. p. 62, 63. In any event, the trial court actually found that Brown "recently violated the conditions of probation, parole, or other supervision that [he] had through the courts," which "is an indicator that options other than prison would likely not be practical or successful for [him]." Tr. p. 430. Therefore, even if the record was unclear about the official length of Brown's probation, the record is clear that Brown was given several different chances to succeed during his four years in the juvenile-justice system, but he failed at all of them. The trial court did not abuse its discretion in finding this aggravator.

Finally, Brown argues that the trial court abused its discretion in finding as an aggravator that he "engaged in this horrible series of crimes and an organized conspiracy with other people." *Id.* He claims that the fact that he acted with others was essentially an element of the crime since he was convicted as an accomplice. In another double-murder case, this Court held that the evidence showing the defendants' careful planning of the murders reflected the deliberate nature of the crime, and the degree of planning for the murders and the fact that two people were killed were "part of the nature and circumstances of the crime." *Hull v. State*, 839 N.E.2d 1250, 1257-58 (Ind. Ct. App.

2005). Because this case required advanced planning in that the trio specifically targeted a drug dealer and went to his house in the middle of the night armed with guns, we find that the trial court properly considered Brown's organized planning with Jacob and Na-Son as an aggravator.[2]

### III. Inappropriate Sentence

Finally, Brown contends that his 150-year sentence is inappropriate in light of the nature of the offenses and his character. He asks us to reduce the murder sentences to the "minimum" with "the murder sentences made consecutive and the robbery sentence concurrent to the murder sentences," that is, ninety years. Appellant's Br. p. 16.

Our rules authorize revision of a sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). "[A] defendant must persuade the appellate court that his or her sentence has met this inappropriateness standard of review." *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

The principal role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case. *Id.* at 1224.

---

[2] To the extent that Brown argues that the trial court did not accord sufficient mitigating weight to his age at the time of the crimes, we note that the relative weight or value assignable to aggravating and mitigating factors is not reviewable for an abuse of discretion. *Anglemyer*, 868 N.E.2d at 491.

A person who commits murder shall be imprisoned for a fixed term of between forty-five and sixty-five years, with the advisory sentence being fifty-five years. Ind. Code § 35-50-2-3. A person who commits a Class B felony shall be imprisoned for a fixed term of between six and twenty years, with the advisory sentence being ten years. Ind. Code § 35-50-2-5. Here, the trial court sentenced Brown to sixty-five years for each murder conviction and twenty years for his Class B felony robbery conviction and ordered the sentences to be served consecutively, for an aggregate term of 150 years. This sentence falls within statutory guidelines.

As for the nature of the offenses, the trial court described the crimes as a "community tragedy." Tr. p. 429. Jacob, Brown, and Na-Son planned to rob a known drug dealer at his home in the middle of the night while armed with guns. While Brown was searching the house for drugs and money, Jacob shot Keya. Na-Son then gave Brown "the look," at which point Stephen was ordered to the bed and Na-Son shot him in the back of the head. The murders are particularly cold-blooded and senseless—Stephen and Keya did not appear to resist in any way after the trio gained entry to their house and were killed simply because the trio did not want to leave behind any witnesses. Prosecutor Rodney Cummings told the trial court during closing arguments that he had encountered several cases in his years as a prosecutor that were difficult to understand, but none quite like this one because it was hard to understand "how such young people can grow up so hard and in such a short life." *Id.* at 401. And although Brown did not pull the trigger, he was armed with a gun and was an active participant in the crimes.

Brown's character is no better. According to Brown's presentence investigation report, he began consuming alcohol and marijuana at the age of ten and used marijuana daily. Appellant's App. p. 66b. Brown committed his first crime at the age of twelve—criminal mischief involving at least $2500, a felony if committed by an adult. Brown has steadily broken the law in an escalating pattern ever since. As the trial court aptly explained, even though Brown was just sixteen years old at the time of the crimes, he "committed early on to a life involving crime and hurting other people." Tr. p. 431. For example, Brown had adjudications for battery resulting in bodily injury in 2009, burglary in 2010, and another burglary committed at about the same time as the crimes in this case. As the trial court found, Brown exhibited no remorse "whatsoever," *id.*, and he exhibited a disturbing callousness about these crimes—ranging from his description of the type of burglar he was, to his explanation of simply killing Stephen and Keya, to flaunting his share of the money after the fact in the pictures.

Although Brown was convicted as an accomplice and received the same sentence as the shooters, Jacob and Na-Son, given his active role before, during, and after the crimes, we do not find that Brown's status as an accomplice in the murders in any way warrants a reduction in his sentence. *See Castillo*, 974 N.E.2d at 467 (our Supreme Court noting that it had reduced sentences for accomplices "whose role in a murder was substantially less blameworthy than the principal's"). Given the heinousness of these crimes and Brown's extremely poor character, we conclude that Brown has failed to persuade us that his sentence of 150 years is inappropriate.

Affirmed.

KIRSCH, J., and BAILEY, J., concur.