## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 15 2015, 6:03 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Erin L. Berger
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: L.D. and K.F. (Minor Children),

B.W. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

June 15, 2015

Court of Appeals Case No. 82A04-1410-JT-505

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

Cause Nos. 82D01-1403-JT-28
82D01-1403-JT-29

**Brown, Judge.**

[1] B.W. ("Father") appeals the involuntary termination of his parental rights with respect to his children, L.D. and K.F. (together, the "Children"). Father raises three issues, which we revise and restate as:

> I. Whether the trial court abused its discretion by denying Father's motion to continue the termination hearing;
>
> II. Whether the trial court abused its discretion by denying Father's motions for a new trial and to correct error; and
>
> III. Whether the evidence is sufficient to support the termination of Father's parental rights.

We affirm.

### Facts and Procedural History

[2] On July 20, 2011, the Indiana Department of Child Services Local Office in Vanderburgh County ("DCS") received a report that K.F. tested positive for THC at birth and that L.D. had also tested positive for THC at birth on December 9, 2009. On July 22, 2011, A DCS case manager met with A.D. ("Mother"), who admitted "to using marijuana during her pregnancy" and "that she last used marijuana on or around 7/20/2011". DCS Exhibit 2 at 2. On August 8, 2011, DCS submitted for the court's approval a Program of Informal Adjustment ("PIA"), which the court approved.[1] Among other things, Mother was to remain drug free as part of the PIA.

---

[1] A Program of Informal Adjustment is a negotiated agreement between a family and a local office of the Indiana Department of Child Services whereby the family agrees to participate in various services in an effort

[3] Despite the requirements of the PIA, Mother failed to submit to drug screens and tested positive for drugs on several drug screens to which she did submit. As a result, the court authorized and DCS filed a Children in Need of Services ("CHINS") petition on December 6, 2011, and that same day, Mother admitted to the allegations in the petition. In its CHINS petition, DCS also alleged that Father used illegal drugs. Father was not present for the initial adjudication of the children as CHINS, but did agree with the finding at a hearing held on March 28, 2012.

[4] Initially, Father did not agree to take part in services provided by DCS; however, on April 11, 2012, he agreed to participate in services. In its dispositional order entered on April 24, 2012, the court ordered Father to participate in a drug treatment program, submit to random drug screens, and remain drug free. The Children were removed from Mother's home and placed in their maternal grandmother's home on May 2, 2012.

[5] On February 25, 2013, a petition to enter judgment of conviction and impose sentence on Father on a charge of possession of marijuana with intent to distribute as a class D felony was filed in Warrick County, and he subsequently "went on the run." Transcript at 15. In July 2013, Father was arrested on charges of possession of marijuana with intent to distribute as a class D felony

to prevent the child or children from being formally deemed a child or children in need of services. *See* Ind. Code § 31-34-8 *et seq.*

and receiving stolen property as a class D felony, and on October 21, 2013, he was found guilty on those charges and sentenced to serve three years.

[6] On March 19, 2014, DCS filed a Verified Petition to Terminate Parental Rights with regard to Father and the Children.[2] The court set a fact-finding hearing for June 10, 2014. At the time of the hearing, Father was incarcerated at Wabash Valley Correctional Facility. At the start of the hearing, Father moved to continue the hearing based upon his release date being sometime between December 2014 and February 2015 and his desire to participate in services so that he may work toward being reunited with the Children. The trial court denied Father's motion.

[7] Father testified that he had last seen the Children two days prior to his arrest in July 2013, and that he had participated in services with DCS until he "was on the run, from February to July" 2013, but admitted that the extent of his participation was that he "[j]ust complied with the Drug Court in Warrick County 'cause that was all they told [him he] had to do." *Id.* at 15. He testified that he participated in a substance abuse treatment program and other programs called Life Recovery, Celebrate Recovery, and Cognitive Thinking while incarcerated, that his release date could be as early as October 23, 2014, if he were to be granted all of the time cuts for which he was eligible, and that, upon

---

[2] Mother voluntarily terminated her parental rights when the petitions were filed. The facts presented are those related to Father.

his release, he planned to "get [his] life situated and come get [his] kids." *Id*. at 22.

[8] Father further testified that he had lived with L.D. in 2009 and part of 2010, and that he had never had custody of either of the Children. When asked what he had done to have the Children placed in his care, Father responded "[n]othing really." *Id*. at 17. He acknowledged that he had never paid child support for the Children and does not have a car, property, or savings, and, when not incarcerated, he has lived with his mother or a friend. He stated that he planned to initially live with his mother or sister and that he had three job opportunities awaiting him upon his release. When asked about his previous employment, Father responded: "I picked up employment right before I went on Drug Court and lost that employment right around November or so. Then I picked up employment again in January but then I quit when I went on the run." *Id*. at 17.

[9] DCS introduced evidence that Father has a criminal history spanning ten years, which includes eighteen misdemeanor and four felony convictions. Specifically, in addition to the most recent felony possession of marijuana with intent to distribute and receiving stolen property convictions, Father had been convicted of criminal trespass as a class D felony and possession of marijuana as a class D felony. Regarding Father's past substance abuse, DCS introduced evidence that Father began using marijuana when he was ten years old and that by the time he was twelve years old he was smoking marijuana daily except when he was incarcerated or on probation, had tried cocaine, prescription

drugs, mushrooms, LSD, and methamphetamine, and began drinking at fifteen years old.

[10] As to Father's participation in Drug Court, DCS introduced evidence that Father tested positive for THC at his July 16, 2012 intake to the program. A week later he admitted to his Drug Court case manager that he enjoys smoking marijuana and that he will smoke it again. On August 7, 2012, he told his case manager that he was done using illegal marijuana, and on October 3, 2012, he tested positive for Tramadol. On October 12, 2012, the Drug Court ordered Father to report to residential treatment on November 16, 2012. Father then failed to attend drug treatment appointments on December 26, 2012, December 31, 2012, and on February 21, 2013. On February 22, 2013, he tested positive for methamphetamine and synthetic cannabinoids. On February 25, 2013, the Warrick County Probation Office filed its petition to enter judgment of conviction and impose sentence because Father had, *inter alia*, violated Drug Court rules.

[11] At the termination hearing, the following exchange occurred during the direct examination of Court Appointed Special Advocate Judy Collins ("CASA Collins") regarding the Children's placement:

> A: Oh, they should absolutely stay with their grandparents. It's all they've ever known. They are happy, well adjusted. I can't imagine how horrible it would be if you took them and put them anywhere else. For one thing they'd have to leave [older sister], not . . . as well as the grandparents and other people in the home. And [grandmother] doesn't have a problem sharing them. If [Father] gets out of jail and cleans up his act and does well he can be apart [sic] of these girls' lives.

I don't see [grandmother] having an issue with that. But I just don't think you disrupt these children's lives because he's decided he's grown up and thinks he can make a difference now.

Q: Is it in the best interest in long run for the children to be where they are now with the maternal grandmother?

A: I believe absolutely it is.

Q: And why do you think that [Father's] rights should be terminated?

A: I feel like he hasn't had any rights. He has not acted on his rights up to this point. [H]e keeps saying he wants his girls back, and there is no back. [H]e never had his girls. He visits his girls, his Mom visits his girls on occasion when he's not on the run or incarcerated. And I just don't have faith that he can take the girls and make a good life for them at this point.

Q: Is there anything else you want to tell the Court?

A: Please leave the children where they are, it's by far in their best interest. And I think if [Father] truly can clean himself up and wants to be a part of their lives he can.

*Id.* at 38-39.

[12] Family Case Manager Katie Melton ("FCM Melton") testified as to why she believes Father's parental rights should be terminated:

Because these girls need permanency. And just from reviewing the records, when he was available to do services and try to gain custody of his kids, he did not. Like he said, he was on the run. And I feel like he could've stepped up and done services and done his time faster if he hadn't been on the run. And he didn't stay drug and alcohol free like we'd asked. These kids are doing great in the home that they're in. I think that they would have significant issues if we did move them into another home.

*Id.* at 46. FCM Melton also testified that it was DCS's plan for the maternal grandparents to adopt the Children. When asked if she thought that adoption

by their grandparents was in the Children's best interest, FCM Melton responded:

> I do. These girls have lived with their grandparents most of their lives. Their needs are met, they're stable. They haven't had to worry about, you know, not having food, not having housing, not having daycare and clothing. They've been provided for. But they've also been provided for, you know, just that nurturing need that they have as well. I think that they've been in the best place they could be.

*Id*. On cross-examination, when asked what she thought the harm would be "in waiting until the Father gets out of jail to see how he does," FCM Melton testified that "I think the harm would be the kids feel like they don't have a home that they're going to stay in. . . . They love their grandparents and they wanna stay there. I mean, they express that all the time." *Id*. at 47.

[13] On August 19, 2014, the court issued its order terminating Father's parental rights to the Children (the "Termination Order") setting forth findings of fact and conclusions thereon consistent with the foregoing.

[14] On August 27, 2014, Father filed a Motion for New Trial Based Upon Newly Discovered Evidence requesting the trial court to reopen the termination proceeding to consider the evidence that he had been granted the time cuts for which he was eligible and that his release date was now scheduled in October 2014 rather than February 2015. On September 18, 2014, Father filed a motion to correct errors on the same basis. The court denied both of Father's motions by noting that in its findings it did "acknowledge[] that the father might be getting released early, but even with an early release the court believes its other

findings support the termination of the father's rights." Appellant's Appendix at 49.

## *Discussion*

### I.

The first issue is whether the trial court abused its discretion by denying Father's motion to continue the termination hearing. Indiana Trial Rule 53.5 provides:

> Upon motion, trial may be postponed or continued in the discretion of the court, and shall be allowed upon a showing of good cause established by affidavit or other evidence. The court may award such costs as will reimburse the other parties for their actual expenses incurred from the delay. A motion to postpone the trial on account of the absence of evidence can be made only upon affidavit, showing the materiality of the evidence expected to be obtained, and that due diligence has been used to obtain it . . . .

At the outset, we acknowledge that the decision whether to grant or to deny a motion to continue rests within the sound discretion of the trial court. *Rowlett v. Vanderburgh Cnty. Office of Family & Children,* 841 N.E.2d 615, 619 (Ind. Ct. App. 2006), *trans. denied*. We will reverse the trial court only for an abuse of that discretion. *Id.* An abuse of discretion may be found in the denial of a motion for a continuance when the moving party has shown good cause for granting the motion. *Id.* However, no abuse of discretion will be found when the moving party has not demonstrated that he or she was prejudiced by the denial. *Id.* Accordingly, Father must show that he has demonstrated good cause to continue the trial and that the denial of his motion caused him prejudice.

[17] Father analogizes his situation to that of the father in *Rowlett*, a case in which this court reversed the trial court's denial of a father's motion to continue. In *Rowlett* we stated that:

> we conclude that Father showed good cause for granting his motion to continue the dispositional hearing—an opportunity for him to participate in services offered by the OFC directed at reunifying him with his children upon his release from prison. We acknowledge that Father requested a continuance because he would still have been incarcerated on the date of the scheduled hearing and recognize that such incarceration was by his own doing. Nevertheless, Father was set to be released only six weeks after the scheduled dispositional hearing. Further, Father has demonstrated prejudice by the denial of his motion for continuance in that his ability to care for his children was assessed as of the date of the hearing he sought to have continued. At that time, Father was incarcerated and had not had the opportunity to participate in services offered by the OFC or to demonstrate his fitness as a parent. The result was that his parental rights were forever and unalterably terminated. This result is particularly harsh where Father, while incarcerated, participated in numerous services and programs, although offered by the correctional facility and not the OFC, which would be helpful to him in reaching his goal of reunification with his children.

*Id.* at 619.

[18] Like the father in *Rowlett*, Father made a motion to continue based on the fact that he would be released from incarceration shortly after the scheduled termination hearing and his desire to participate in services geared toward reunification with Children. Unlike in *Rowlett*, however, Father fails to demonstrate that he has been prejudiced by the denial of his motion to continue. The facts of *Rowlett* reveal that the father had expressed desire for reunification starting on the very day his children were removed and that he

was active in the CHINS case. *Id*. at 617-618. Further, he undertook 1,100 hours of appropriate programs, and he maintained his relationship with the children by letters and phone calls from prison. *Id.* at 622. Critically, he had been incarcerated for all but two months of the action and had not been given a full opportunity "to participate in services offered by the OFC directed at reunifying him with his children upon his release from prison." *Id*. at 619. By contrast, Father here had more than a year between the adjudication of the Children as CHINS and his current incarceration in which to participate in services with DCS, yet he failed to complete a substantial amount of those services and initially did not want to participate at all. Additionally, Father chose to go "on the run" during the time he could have been completing services. Transcript at 18. For these reasons, we conclude that the court did not abuse its discretion by denying Father's motion to continue.

## II.

[19] The next issue is whether the trial court abused its discretion by denying Father's motions for a new trial and to correct error. Initially, a party seeking to have the court reopen the evidence must demonstrate that:

> (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial.

*Speedway SuperAmerica*, LLC v. Holmes, 885 N.E.2d 1265, 1271 (Ind. 2008) (quoting *Carter v. State,* 738 N.E.2d 665, 671 (Ind. 2000)), *reh'g denied*.

[20] Our standard of review of a trial court's ruling on a motion to correct error is well settled:

> A trial court has broad discretion in ruling on a motion to correct error. We will reverse only for an abuse of that discretion. An abuse of discretion occurs if the decision was against the logic and effect of the facts and circumstances before the court or if the court misapplied the law.

*Brown v. Brown,* 979 N.E.2d 684, 685 (Ind. Ct. App. 2012) (internal citations omitted).

[21] Father is not entitled to relief because the evidence of his early release was not newly discovered. At the termination hearing, the court heard Father's testimony concerning the possibility that he could be released as early as October 23, 2014. The court took the possibility of Father's early release into account in its findings by noting that "[c]urrently, [Father] is serving prison time for a felony conviction of dealing in marijuana after violating his probation. His release date is February 19, 2015, *pending any further time credits*." Appellant's Appendix at 44 (emphasis added). When the trial court denied Father's motions to reopen the evidence and to correct error, it cited to this finding and stated it had "acknowledged that the Father might be getting released early," which demonstrates that it did consider this evidence. *Id*. at 49. Furthermore, the evidence of his earlier release date would not have likely produced a different result at retrial, as the court in its order denying the motion

stated that "even with an early release the court believes its other findings support the termination of the Father's rights." *Id*. at 49. Consequently, we conclude the court did not abuse its discretion in denying the Father's motions for a new trial and to correct error.

## III.

[22] The next issue is whether the evidence is sufficient to support the termination of Father's parental rights. The involuntary termination of parental rights is the most extreme measure that a juvenile court can impose and is designated only as a last resort when all other reasonable efforts have failed. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). This policy is in recognition of the Fourteenth Amendment to the United States Constitution which provides parents with the right to establish a home and raise children. *Id.* However, these protected parental rights are not absolute and must be subordinated to the children's interest to maintain the parent-child relationship. *Id.*; *see also Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992) (noting that the "purpose of terminating parental rights is not to punish parents, but to protect the children") (citing *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 101 S. Ct. 2153 (1981), *reh'g denied*). Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a trial court need not wait until a child is irreversibly harmed before terminating the parent-child

relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[23] In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child; . . .

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

[24] In accordance with Ind. Code § 31-35-2-8(c), the trial court's judgment contains specific findings of fact and conclusions thereon. We therefore apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child

relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied*, 534 U.S. 1161, 122 S. Ct. 1197 (2002); *see also Bester*, 839 N.E.2d at 147; *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (noting that this court will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made") (quoting *Egly*, 592 N.E.2d at 1235). Thus, if the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[25]   The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* "Reviewing whether the evidence 'clearly and convincingly' supports the findings, or the findings 'clearly and convincingly' support the judgment, is not a license to reweigh the evidence." *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87

S. Ct. 824 (1967), *reh'g denied*). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A)).

[26] Father challenges the Termination Order based upon the requirements of Ind. Code § 31-35-2-4(b)(2)(B)-(C).

A. *Remedy of Conditions*

[27] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of the Children outside Father's custody will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[28] In determining whether there exists a reasonable probability that the conditions resulting in a child's removal or continued placement outside a parent's care will not be remedied, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). Due to the permanent effect of termination, the trial court must also evaluate the parent's habitual patterns of conduct to determine the probability

of future neglect or deprivation of the child. *Id*. The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, "but also those bases resulting in the continued placement outside the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *McBride*, 798 N.E.2d at 199. Moreover, a trial court "can reasonably consider the services offered by the [DCS] to the parent and the parent's response to those services." *Id*. In addition, "[w]here there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). The burden for the DCS is to establish "only that there is a reasonable probability that the parent's behavior will not change." *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[29] In determining that there is a reasonable probability Father's behavior will not change and the conditions resulting in Children's removal and continued placement outside Father's care will not be remedied, the court made the following pertinent and unchallenged findings, which we take as true:

> 11. During the course of the wardship, [Father] has been incarcerated on the following dates: October 27, 2011 through November 2, 2011; April 25, 2012 through April 30, 2012; November 15, 2012 through December 5, 2012; and July 16, 2013 through October 20, 2013 before

the incarceration time concerning his present conviction. At the time of the trial on June 10, 2014, [Father] had been incarcerated for three (3) months at Wabash Valley Correctional Facility.

12. [Father] has multiple convictions besides his current felony for dealing marijuana including three (3) convictions for conversion, one (1) conviction for criminal mischief, three (3) convictions for possession of marijuana and/or hash oil, one (1) conviction for false informing, one (1) conviction for aggressive driving, and two (2) convictions for possession of paraphernalia.

13. Currently, [Father] is serving prison time for a felony conviction of dealing in marijuana after violating his probation. His release date is February 19, 2015, pending any further time credits.

14. [Father] did not follow the rules in the Warrick County Criminal Drug Court leading to his current incarceration. After seven (7) months in the Warrick County Criminal Drug Court, he failed to return to the program for five (5) months.

15. During the five (5) months that [Father] failed to return to the Warrick County Criminal Drug Court, he also did not participate in any services concerning the Child in Need of Services cases.

16. The last time that [Father] saw his children was on July 2013 before he was incarcerated on his current felony.

17. For his services in the Child in Need of Services cases, [Father] was ordered to complete his probation and drug court obligation in Warrick County; he failed to complete.

18. [Father] was ordered to do drug screens in the Child in Need of Services cases, which he admits he failed to do.

19. [Father] admitted that he had not done anything to get the children in his care or completed any required services.

20. [Father] has not paid any child support.

21. [Father] has not maintained stable employment or housing.

22. [Father] was inpatient at Stepping Stone for twenty-one (21) days as part of Warrick County Drug Court obligation from November 15, 2012 through December 5, 2012. He failed to benefit from this treatment.

23. [Father] has never had the care and custody of [Children].

24. CASA believes it is in the best interest for the children to be adopted.

25. CASA believes it is in the best interest of the children for the father's rights to be terminated as current placement as [sic] always been in the children's lives.

26. Father was knowing [sic] on the run from authorities and chose to absent himself from services and his children during this time period.

Appellant's Appendix at 44-45.

[30] The sole finding Father appears to challenge is Finding 27, which states: "While the [F]ather might have good intentions that he is going to straighten his life out, little in his past indicates that he will be successful." *Id*. at 45. In support of his contention that he may be successful in "straighten[ing] his life out," Father points to his own testimony that he participated in services with DCS up until the point that he went "on the run," that upon his release he planned to get his "life situated and come get his kids," and that he had three job opportunities awaiting him upon release. Transcript at 15, 22. Additionally, Father testified that he had participated in substance abuse programs and Celebrate Recovery, Life Recovery, and Cognitive Thinking while incarcerated and that he had "grown up a lot over the last year . . . ." *Id*. at 30. To the extent Father challenges this finding, he does so by asking us to reweigh the evidence, which we will not do. *In re E.M.*, 4 N.E.3d at 642. We conclude that the court's findings are clearly and convincingly supported by evidence presented by DCS.

[31]     Next, we examine whether the court's judgment is clearly erroneous. In the Termination Order, the court concluded that there was a reasonable probability that the conditions which resulted in the removal of the Children from Father's care will not be remedied, noting specifically that "[F]ather has never had custody of the children, he is currently incarcerated and based upon his prior criminal record, work record and instability it would be highly unlikely that he can ever care for the children." Appellant's Appendix at 46.

[32]     As noted, Father challenged only one of the court's Findings of Fact, which leaves the remainder to be taken as true. Despite his arguments that his efforts to better his life warrant reversal, the unchallenged findings provide ample support for the court's conclusion to terminate his parental rights. Father has been convicted of four felonies and multiple misdemeanors, several of which occurred after the birth of Children and some after Children were removed from Mother's custody in May 2012. In 2013, Father was either incarcerated or on the run for ten and a half months, and, at the time of the trial, he was incarcerated on convictions for two felonies that occurred in the last two years. In addition, despite being afforded the opportunity through Drug Court to help address his substance abuse problems, Father missed treatment appointments, tested positive for drugs, and subsequently had his involvement with the Drug Court revoked. Furthermore, when questioned at the termination hearing about what he had done to have the Children placed in his care, Father responded, "[n]othing really." Transcript at 17. Based upon the unchallenged findings, the court's conclusion that there was a reasonable probability that the

conditions leading to the Children's removal would not be remedied is supported by ample evidence and is not clearly erroneous.

B. *Best Interests*

[33] We next consider Father's assertion that DCS failed to demonstrate that termination of his parental rights was in the Children's best interests. We are mindful that in determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and to the totality of the evidence. *McBride*, 798 N.E.2d at 203. In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Children have a paramount need for permanency, which the Indiana Supreme Court has called a central consideration in determining the child's best interests. *In re E.M.*, 4 N.E.3d at 647-648. However, "focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry . . . ." *Id.* at 648. This court has previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*. This court has also previously recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful

relationships with their children." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*.

[34] At the termination hearing, FCM Melton testified that she believes Father's parental rights should be terminated "[b]ecause these girls need permanency. . . . These kids are doing great in the home that they're in. I think that they would have significant issues if we did move them into another home." Transcript at 46. When asked why she thought that Father's rights should be terminated, CASA Collins stated "I feel like he hasn't had any rights. . . . I just don't have faith that he can take the girls and make a good life for them at this point." *Id*. at 39. CASA Collins also testified, "[p]lease leave the children where they are, it's by far in their best interest." *Id*.

[35] Based on the totality of the evidence as discussed and set forth in the trial court's order, including the recommendation of FCM Melton and CASA Collins, and in light of our deferential standard of review, we conclude that the court's determination that termination is in the Children's best interests is supported by clear and convincing evidence and is not clearly erroneous. *See In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013) (observing that "[r]ecommendations of the case manager . . . in addition to evidence the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests"), *reh'g denied*; *In re A.I.*, 825 N.E.2d at 811 (testimony of court appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside the home will not be remedied, is sufficient to

prove by clear and convincing evidence termination is in child's best interests), *trans. denied*; *see also In re E.M.* 4 N.E.3d at 649 (holding that incarceration alone cannot justify "tolling" a child welfare case and concluding that, because the trial court could reasonably have reached either conclusion, our deferential standard of review is dispositive and it was not clearly erroneous for the trial court to conclude that, after three and a half years, Father's efforts simply came too late, and that the children needed permanency even more than they needed a final effort at family preservation.)

## *Conclusion*

[36] We conclude that the trial court's judgment terminating the parental rights of Father is supported by clear and convincing evidence. We find no error and affirm.

[37] Affirmed.

Crone, J., and Pyle, J., concur.